# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 97-2618

_____

Southwestern Bell Telephone Company,     *
             *

           Petitioner,     *
             *

Southern New England Telephone     *
Company; Texas Office of Public     *
Utility Counsel; United States Telephone *
Association; Ameritech Corporation;     *
U S West, Inc.; Rural Telephone     *
Coalition; Cincinnati Bell Telephone     *
Company; GTE Service Corporation;     *
GTE Alaska, Incorporated; GTE     *
Arkansas, Incorporated; GTE     *
California, Incorporated; GTE Florida,     *     Petitions for Review of an Order of the
Incorporated; GTE Midwest,     *     Federal Communications Commission
Incorporated; GTE South Incorporated;     *
GTE Southwest, Incorporated; GTE     *
North, Incorporated; GTE Hawaiian     *
Telephone Company, Incorporated;     *
GTE West Coast, Incorporated; Contel     *
of Minnesota, Inc.; Contel of the South,     *
Inc.; Missouri Public Service     *
Commission; GTE Northwest,     *
Incorporated; Pacific Bell; Nevada Bell,     *
             *

           Intervenors on Appeal,     *
             *

        v.     *
             *

Federal Communications Commission;     *
United States of America,     *

*

Respondents,                                *
                                            *
Association for Local Tele-                 *
communications Services; American           *
Telephone and Telegraph Company;            *
Telecommunications Resellers                *
Association; The Competition Policy         *
Institute; Information Technology           *
Association of America; National Cable      *
Television Association, Inc.; Internet      *
Access Coalition; Ad Hoc Tele-              *
communications Users Committee;             *
WorldCom, Inc.; Sprint Corporation;         *
Teleco Communications Group, Inc.;          *
Excel Telecommunications, Inc.; Bell        *
Atlantic Telephone Companies; Time          *
Warner Communications Holdings, Inc.;       *
MCI Telecommunications Corporation;         *
New York Telephone; New England             *
Telephone and Telegraph Company,            *
                                            *
   Intervenors on Appeal,    *
                                            *
--------------------                        *
                                            *
America's Carriers Telecommunication        *
Association,                                *
                                            *
   Intervenors on Appeal,    *
                                            *
Commercial Internet Exchange                *
Association,                                *
                                            *
   Amicus Curiae.            *

-3-

_____

No. 97-2661
_____

GTE Midwest, Incorporated,                         *
                                                   *
          Petitioner,                              *
                                                   *
The Southern New England Telephone                 *
Company; U S West, Inc.; Ameritech                 *
Corporation; Texas Office of Public                *
Utility Counsel; United States Telephone           *
Association; Southwestern Bell                      *
Telephone Company; Rural Telephone                 *
Coalition; Cincinnati Bell Telephone               *
Company; Missouri Public Service                   *
Commission; Pacific Bell; Nevada Bell,             *
                                                   *
          Intervenors on Appeal,                   *
                                                   *
     v.                                            *
                                                   *
Federal Communications Commission;                 *
United States of America,                          *
                                                   *
          Respondents,                             *
                                                   *
American Telephone and Telegraph                   *
Company; Telecommunications                        *
Resellers Association; The Competition             *
Policy Institute; Excel Tele-                       *
communications, Inc.; Telco                         *
Communications Group, Inc.; Sprint                 *
Corporation; WorldCom, Inc.; Ad Hoc                *
Telecommunications Users Committee;                *
Internet Access Coalition; National                *

Cable Television Association, Inc.;          *
Information Technology Association of         *
America; Association for Local Tele-          *
communications Services; Bell Atlantic        *
Telephone Companies; Time Warner              *
Communications Holdings, Inc.; MCI            *
Telecommunications Corporation;               *
New York Telephone; New England              *
Telephone and Telegraph Company,              *
                                              *
     Intervenors on Appeal,          *
                                              *
----------------------------                  *
                                              *
America's Carriers Telecommunication         *
Association,                                  *
                                              *
     Intervenors on Appeal,          *
                                              *
Commercial Internet Exchange                  *
Association,                                   *
                                              *
     Amicus Curiae.                  *

_____

No.  97-2856
_____

Bell Atlantic-Virginia, Incorporated,         *
                                              *
     Petitioner,                     *
                                              *
Southern New England Telephone                *
Company; Ameritech Corporation;               *
Texas Office of Public Utility Counsel;       *
United States Telephone Association;          *

Southwestern Bell Telephone Company; *
U S West, Inc.; Rural Telephone *
Coalition; Bell Atlantic Telephone *
Companies; Cincinnati Bell Telephone *
Company; GTE Service Corporation; *
GTE Alaska, Incorporated; GTE *
Arkansas, Incorporated; GTE California, *
Incorporated; GTE Florida, *
Incorporated; GTE Midwest, *
Incorporated; GTE South, Incorporated; *
GTE Southwest, Incorporated; GTE *
North, Incorporated; GTE Northwest, *
Incorporated; GTE Hawaiian Telephone *
Company, Incorporated; GTE West *
Coast, Incorporated; Contel of *
Minnesota, Inc.; Contel of the South, *
Inc.; Missouri Public Service *
Commission; Pacific Bell; Nevada Bell, *
  *

       Intervenors on Appeal, *

  *

    v. *

  *

Federal Communications Commission; *
United States of America, *

  *

       Respondents, *

  *

The Competition Policy Institute; *
America's Carriers Telecommunication *
Association; Excel Telecommunications, *
Inc.; Telco Communications Group, Inc.; *
Sprint Corporation; WorldCom, Inc.; *
Ad Hoc Telecommunications Users *
Committee; Internet Access Coalition; *
National Cable Television Association, *
Inc.; Information Technology *

-6-

Association of America; American          *
Telephone and Telegraph Company;         *
Association for Local Tele-              *
communications Services; Tele-          *
communications Resellers Association;    *
Time Warner Communications Holdings,*
Inc.; MCI Telecommunications             *
Corporation,                             *
                                         *
         Intervenors on Appeals     *
                                         *
----------------------------             *
                                         *
Commercial Internet Exchange             *
Association.                             *
                                         *

         Amicus Curiae.

_____

No.  97-2866
_____

Cable & Wireless, Inc.,                  *
                                         *
         Petitioner,                 *
                                         *
Competitive Telecommunications           *
Association; America's Carriers          *
Telecommunication Association; Excel     *
Telecommunications, Inc.; Telco          *
Communications Group, Inc.;              *
WorldCom, Inc.; Texas Office of Public   *
Utility Counsel; Telecommunications      *
Resellers Association; Missouri Public   *
Service Commission,                      *
                                         *

Intervenors on Appeal,  *
                        *
       v.               *
                        *
Federal Communications Commission;  *
United States of America,           *
                        *
       Respondents,     *
                        *
The Competition Policy Institute;   *
Ameritech Corporation; Sprint       *
Corporation; Ad Hoc Tele-           *
communications Users Committee;     *
Internet Access Coalition; National *
Cable Television Association, Inc.; *
Information Technology Association of *
America; Southwestern Bell Telephone *
Company; American Telephone and     *
Telegraph Company; Association for  *
Local Telecommunications Services;  *
U S West, Inc.; Rural Telephone     *
Coalition; Southern New England     *
Telephone Company; Bell Atlantic    *
Telephone Companies; Cincinnati Bell *
Telephone Company; GTE Service      *
Corporation; GTE Alaska, Incorporated; *
GTE Arkansas, Incorporated; GTE     *
California, Incorporated; GTE Florida, *
Incorporated; GTE Midwest,          *
Incorporated; GTE South, Incorporated; *
GTE Southwest, Incorporated; GTE    *
North, Incorporated; GTE Northwest, *
Incorporated; GTE Hawaiian Telephone *
Company, Incorporated; GTE West     *
Coast, Incorporated; Contel of      *
Minnesota, Inc.; Contel of the South, *
Inc.; Time Warner Communications    *

-8-

Holdings, Inc.; Pacific Bell; Nevada    *
Bell; BellSouth Corporation; BellSouth    *
Telecommunications, Inc.; New York    *
Telephone Company; New England    *
Telephone and Telegraph Company,    *

          Intervenors on Appeal,    *

------------------------------    *

Commercial Internet Exchange    *
Association,    *

          Amicus Curiae.    *

_____

No.  97-2873
No.  97-2875
_____

MCI Telecommunications Corporation;    *

          Petitioner,    *

Telecommunications Resellers    *
Association; Allied Associated Partners,    *
LP; GELD Information Systems;    *
Competitive Telecommunications    *
Association; America's Carriers Tele-    *
communication Association; Excel Tele-    *
communications, Inc.; Telco    *
Communications Group, Inc.;    *
WorldCom, Inc.; Texas Office of Public    *
Utility Counsel; Cable & Wireless, Inc.;    *
Frontier Corporation; Missouri Public    *
Service Commission,    *

-9-

|                                                              |     |
| ------------------------------------------------------------ | --- |
|                                                              | *   |
| Intervenors on Appeal,                                       | *   |
|                                                              | *   |
| v.                                                           | *   |
|                                                              | *   |
| Federal Communications Commission;                           | *   |
| United States of America,                                    | *   |
|                                                              | *   |
| Respondents,                                                 | *   |
|                                                              | *   |
| Association for Local Tele-                                   | *   |
| communications Services; American                            | *   |
| Telephone and Telegraph Company;                             | *   |
| The Competition Policy Institute;                            | *   |
| Ameritech Corporation; Sprint                                | *   |
| Corporation; Ad Hoc Tele-                                    | *   |
| communications Users Committee;                              | *   |
| Internet Access Coalition; National                          | *   |
| Cable Television Association, Inc.;                          | *   |
| Information Technology Association of                        | *   |
| America; Southwestern Bell Telephone                         | *   |
| Company, U S West, Inc.; Rural                                | *   |
| Telephone Coalition; Southern New                            | *   |
| England Telephone Company; Bell                              | *   |
| Atlantic Telephone Companies;                                | *   |
| Cincinnati Bell Telephone Company;                           | *   |
| GTE Service Corporation; GTE Alaska,                         | *   |
| Incorporated; GTE Arkansas,                                   | *   |
| Incorporated; GTE California,                                | *   |
| Incorporated; GTE Florida,                                    | *   |
| Incorporated; GTE Midwest,                                    | *   |
| Incorporated; GTE South, Incorporated;                       | *   |
| GTE Southwest, Incorporated; GTE                             | *   |
| North, Incorporated; GTE Northwest,                          | *   |
| Incorporated; GTE Hawaiian Telephone                         | *   |
| Company, Incorporated; GTE West                              | *   |
| Coast, Incorporated; Contel of                               | *   |

Minnesota; Contel of the South; Time          *
Warner Communications Holdings, Inc.;         *
Pacific Bell; Nevada Bell; BellSouth          *
Corporation; BellSouth Tele-                  *
communications, Inc.; New York                *
Telephone Company; New England                *
Telephone and Telegraph Company,              *
                                              *
        Intervenors on Appeal,       *
                                              *
----------------------------                  *
                                              *
Commercial Internet Exchange                  *
Association,                                   *
                                              *
        Amicus Curiae.               *

_____

No.  97-2877
_____

U S West, Inc.,                               *
                                              *
        Petitioner,                  *
                                              *
Southern New England Telephone                *
Company; Ameritech Corporation;               *
Texas Office of Public Utility Counsel;       *
United States Telephone Association;          *
Southwestern Bell Telephone Company;          *
Rural Telephone Coalition; Bell Atlantic      *
Telephone Companies; Cincinnati Bell          *
Telephone Company; GTE Service                *
Corporation; GTE Alaska, Incorporated;        *
GTE Arkansas, Incorporated; GTE               *
California, Incorporated; GTE Florida,        *

-11-

Incorporated; GTE Midwest,     *
Incorporated; GTE South, Incorporated;  *
GTE Southwest, Incorporated; GTE    *
North, Incorporated; GTE Northwest,   *
Incorporated; GTE Hawaiian Telephone  *
Company, Incorporated; GTE West     *
Coast, Incorporated; Contel of       *
Minnesota, Inc.; Contel of the South,   *
Inc.; Missouri Public Service       *
Commission; Pacific Bell; Nevada Bell,  *
                                  *

         Intervenors on Appeal,      *
                                  *

         v.                     *
                                  *

Federal Communications Commission;   *
United States of America,        *
                                  *

           Respondents,        *
                                  *

American Telephone and Telegraph    *
Company; The Competition Policy     *
Institute; Excel Telecommunications,   *
Inc.; Telco Communications Group, Inc.; *
Sprint Corporation; WorldCom, Inc.;   *
Ad Hoc Telecommunications Users    *
Committee; Internet Access Coalition;  *
National Cable Television Association,  *
Inc.; Information Technology        *
Association of America; Association    *
for Local Telecommunications Services; *
Telecommunications Resellers      *
Association; Bell Atlantic-Washington,  *
D.C.; Time Warner Communications   *
Holdings, Inc.; MCI Tele-         *
communications Corporation; New York *
Telephone Company; New England    *

Telephone and Telegraph Company,  *

            *

    Intervenors on Appeal,  *

            *

-----------------------------  *

            *

America's Carriers Telecommunication *

Association,        *

            *

    Intervenors on Appeal,  *

            *

Commercial Internet Exchange  *

Association,        *

            *

    Amicus Curiae.    *

      _____

     No.  97-3012

      _____

LCI International Telecom Corporation, *

            *

     Petitioner,    *

            *

Competitive Telecommunications  *

Association; America's Carriers Tele- *

communication Association; Excel Tele- *

communications, Inc.; Telco   *

Communications Group, Inc.;  *

WorldCom, Inc.; Texas Office of Public *

Utility Counsel; Telecommunications *

Resellers Association; Missouri Public *

Service Commission,    *

            *

    Intervenors on Appeal,  *

            *

                       v.                          *
                                                   *
Federal Communications Commission;                 *
United States of America,                          *
                                                   *
               Respondents,                        *
                                                   *
The Competition Policy Institute;                  *
Ameritech Corporation; Sprint                      *
Corporation; Ad Hoc Tele-                          *
communications Users Committee;                    *
Internet Access Coalition; National                *
Cable Television Association, Inc.;                *
Information Technology Association of               *
America; Southwestern Bell Telephone               *
Company; American Telephone and                    *
Telegraph Company; Association for                 *
Local Telecommunications Services;                 *
U S West, Inc.; Rural Telephone                    *
Coalition; Southern New England                    *
Telephone Company; Bell Atlantic                   *
Telephone Companies; Cincinnati Bell               *
Telephone Company; GTE Service,                    *
Corporation; GTE Alaska, Incorporated;             *
GTE Arkansas, Incorporated; GTE                    *
California, Incorporated; GTE Florida,             *
Incorporated; GTE Midwest,                         *
Incorporated; GTE South, Incorporated;             *
GTE Southwest, Incorporated; GTE                   *
North, Incorporated; GTE Northwest,                *
Incorporated; GTE Hawaiian Telephone               *
Company, Incorporated; GTE West                    *
Coast, Incorporated; Contel of                     *
Minnesota, Inc.; Contel of the South,              *
Inc.; Time Warner Communications                   *
Holdings, Inc.; Pacific Bell; Nevada               *
Bell; BellSouth Corporation; BellSouth             *

-14-

Telecommunications, Inc.; New York       *
Telephone Company; New England           *
Telephone and Telegraph Company,         *
                                         *
          Intervenors on Appeal,         *
                                         *
-----------------------------            *
                                         *
Commercial Internet Exchange             *
Association,                             *
                                         *
          Amicus Curiae.                 *

_____

No.  97-3271

_____

GTE Service Corporation; GTE Alaska,     *
Incorporated; GTE Arkansas,              *
Incorporated; GTE California,            *
Incorporated; GTE Florida,               *
Incorporated; GTE South, Incorporated;   *
GTE Southwest, Incorporated; GTE         *
North, Incorporated; GTE Northwest,      *
Incorporated; GTE Hawaiian Telephone     *
Company; GTE West Coast,                 *
Incorporated; Contel of California, Inc.; *
Contel of Minnesota, Inc.; Contel of the *
South, Inc.,                             *
                                         *
          Petitioners,                   *
                                         *
Ameritech Corporation; Texas Office of   *
Public Utility Counsel; Rural Telephone  *
Coalition; Southern New England          *
Telephone Company; U S West, Inc.;       *

Southwestern Bell Telephone Company;  *
United States Telephone Association;   *
Missouri Public Service Commission;    *
Pacific Bell; Nevada Bell,              *
                                        *
   Intervenors on Appeal,   *
                                        *
  v.                          *
                                        *
Federal Communications Commission;     *
United States of America,               *
                                        *
   Respondents,          *
                                        *
WorldCom, Inc.; American Telephone      *
and Telegraph Company; Tele-            *
communications Resellers Association;   *
Association for Local Tele-             *
communications Services; Sprint         *
Corporation; Ad Hoc Tele-               *
communications Users Committee;         *
National Cable Television Association;  *
Internet Access Coalition; Information  *
Technology Association of America;      *
The Competition Policy Institute; Excel *
Telecommunications, Inc.; Telco         *
communications Group, Inc.; Bell        *
Atlantic Telephone Companies; Time      *
Warner Communications Holdings, Inc.;   *
MCI Telecommunications Corporation;     *
New York Telephone Company; New         *
England Telephone and Telegraph         *
Company,                                *
                                        *
   Intervenors on Appeal,   *
                                        *
-----------------------------           *

-16-

```
                                              *
America's Carriers Telecommunication          *
Association;                                  *
                                              *
            Intervenors on Appeal,            *
                                              *
Commercial Internet Exchange                  *
Association,                                  *
                                              *
            Amicus Curiae.                     *


                 _____


                 No. 97-3272
                 _____


Bell Atlantic Telephone Companies;            *
                                              *
            Petitioner,                        *
                                              *
Ameritech Corporation; Texas Office of        *
Public Utility Counsel; Rural Telephone       *
Coalition; Southern New England               *
Telephone Company; U S West, Inc.;            *
Southwestern Bell Telephone Company;          *
United States Telephone Association;          *
Bell Atlantic Telephone Companies;            *
GTE Service, Corporation; GTE Alaska,         *
Incorporated; GTE Arkansas,                   *
Incorporated; GTE California,                 *
Incorporated; GTE Florida,                    *
Incorporated; GTE Midwest,                    *
Incorporated; GTE South, Incorporated;        *
GTE Southwest, Incorporated, GTE              *
North, Incorporated; GTE Northwest,           *
Incorporated; GTE Hawaiian Telephone          *
Company, Incorporated; GTE West               *
```

Coast, Incorporated; Contel of             *
Minnesota; Contel of the South;            *
Missouri Public Service Commission;        *
Pacific Bell; Nevada Bell,                  *
                                            *
       Intervenors on Appeal,       *
                                            *
    v.                              *
                                            *
Federal Communications Commission;         *
United States of America,                   *
                                            *
       Respondents,                 *
                                            *
WorldCom, Inc.; American Telephone         *
and Telegraph Company, Tele-               *
communications Resellers Association;      *
Association for Local Tele-                *
communications Services; Sprint            *
Corporation; Ad Hoc Tele-                  *
communications Users Committee;            *
National Cable Television Association;     *
Internet Access Coalition; Information     *
Technology Association of America;         *
The Competition Policy Institute; Excel    *
Telecommunications, Inc.; Telco            *
Communications Group, Inc.; America's      *
Carriers Telecommunication                 *
Association; Time Warner                    *
Communications Holdings, Inc.; MCI         *
Telecommunications Corporation,            *
                                            *
       Intervenors on Appeal,       *
                                            *
----------------------------               *
                                            *
Commercial Internet Exchange                *

Association,                             *
                                        *
         Amicus Curiae.                 *


                 _____

                 No.  97-3274
                 _____


New York Telephone Company; New         *
England Telephone and Telegraph         *
Company,                                *
                                        *
             Petitioners,               *
                                        *
Ameritech Corporation; Texas Office of  *
Public Utility Counsel; Rural Telephone *
Coalition; Southern New England         *
Telephone Company; U S West, Inc.;      *
Southwestern Bell Telephone Company;    *
United States Telephone Association;     *
Bell Atlantic Telephone Companies;      *
GTE Service, Corporation; GTE Alaska,   *
Incorporated; GTE Arkansas,             *
Incorporated; GTE California,           *
Incorporated; GTE Florida,              *
Incorporated; GTE Midwest,              *
Incorporated; GTE South, Incorporated;  *
GTE Southwest, Incorporated; GTE        *
North, Incorporated; GTE Northwest,     *
Incorporated; GTE Hawaiian Telephone    *
Company, Incorporated; GTE West         *
Coast, Incorporated; Contel of          *
Minnesota; Contel of the South;         *
Missouri Public Service Commission;     *
Pacific Bell; Nevada Bell,              *
                                        *

             Intervenors on Appeal,        *
                                           *
        v.                                 *
                                           *
Federal Communications Commission;         *
United States of America,                  *
                                           *
             Respondents,                  *
                                           *
WorldCom, Inc.; American Telephone         *
and Telegraph Company; Tele-               *
communications Resellers Association;      *
Association for Local Tele-                *
communications Services; Sprint            *
Corporation; Ad Hoc Tele-                  *
communications Users Committee;            *
National Cable Television Association;     *
Internet Access Coalition; Information     *
Technology Association of America;         *
The Competition Policy Institute; Excel    *
Telecommunications, Inc.; Telco            *
Communications Group, Inc.; America's      *
Carriers Telecommunication                 *
Association; Time Warner                   *
Communications Holdings, Inc.; MCI         *
Telecommunications Corporation,            *
                                           *
             Intervenors on Appeal,        *
                                           *
------------------------------             *
                                           *
Commercial Internet Exchange               *
Association,                               *
                                           *
             Amicus Curiae.                *

-20-

_____

No. 97-3477

_____

Texas Office of Public Utility Counsel;   *

  *

Petitioner,   *

  *

Rural Telephone Coalition; Missouri   *
Public Service Commission; Missouri   *
Office of the Public Counsel; Florida   *
Office of the Public Counsel; Indiana   *
Office of Utility Consumer Counselor;   *
Iowa Office of Consumer Advocate;   *
District of Columbia Office of Public   *
Counsel; New Jersey Division of the   *
Ratepayer Advocate; The Utility Reform  *
Network; Maryland Office of People's   *
Counsel; Minnesota Office of Attorney   *
General; Pennsylvania Office of   *
Consumer Advocate; Washington   *
Office of Attorney General Public   *
Counsel Section,   *

  *

Intervenors on Appeal,   *

  *

v.   *

  *

Federal Communications Commission;   *
United States of America,   *

  *

Respondents,   *

  *

American Telephone and Telegraph   *
Company; WorldCom, Inc.; Ad Hoc   *

-21-

Telecommunications Users Committee;    *
Telecommunications Resellers    *
Association; Association for Local    *
Telecommunications Services; Sprint    *
Corporation; National Cable Television    *
Association; Internet Access Coalition;    *
Information Technology Association of    *
America; The Competition Policy    *
Institute; Excel Telecommunications,    *
Inc.; Telco Communications Group,    *
Inc.; America's Carriers Tele-    *
communication Association; Time    *
Warner Communications Holdings, Inc.;    *
BellSouth Corporation; BellSouth Tele-    *
communications, Inc.; GTE Service    *
Corporation; GTE Alaska, Incorporated;    *
GTE California, Incorporated;    *
GTE Florida, Incorporated; GTE    *
Midwest, Incorporated; GTE South,    *
Incorporated; GTE Southwest,    *
Incorporated; GTE Northwest,    *
Incorporated; GTE Hawaiian Telephone    *
Company, Incorporated; GTE West    *
Coast, Incorporated; Contel of    *
Minnesota, Inc.; Contel of the South,    *
Inc.; Southwestern Bell Telephone    *
Company; U S West, Inc.; Pacific Bell;    *
Nevada Bell; MCI Telecommunications    *
Corporation,    *
    *
Intervenors on Appeal,    *
    *
----------------------------    *
    *
Commercial Internet Exchange    *
Association,    *
    *

-22-

Amicus Curiae.                    *


_____

No.  97-3557
_____

Cincinnati Bell Telephone Company,        *
                                          *
          Petitioner,                     *
                                          *
Texas Office of Public Utility Counsel;   *
Rural Telephone Coalition; United         *
States Telephone Association; South-      *
western Bell Telephone Company;           *
Missouri Public Service Commission;       *
Pacific Bell; Nevada Bell,                *
                                          *
          Intervenors on Appeal,          *
                                          *
     v.                                   *
                                          *
Federal Communications Commission;        *
United States of America,                 *
                                          *
          Respondents,                    *
                                          *
WorldCom, Inc.; American Telephone        *
and Telegraph Company; Tele-              *
communications Resellers Association;     *
Association for Local Tele-               *
communications Services; Sprint           *
Corporation; Ad Hoc Tele-                 *
communications Users Committee;           *
National Cable Television Association;     *
Internet Access Coalition; Information     *

Technology Association of America; *
The Competition Policy Institute; Excel *
Telecommunications, Inc.; Telco *
Communications Group, Inc.; Time *
Warner Communications Holdings, Inc.; *
MCI Telecommunications Corporation; *
Bell Atlantic Telephone Companies; *
New York Telephone Company; New *
England Telephone and Telegraph *
Company; Ameritech Corporation, *
 *

   Intervenors on Appeal, *
 *

------------------------------ *
 *

America's Carriers Telecommunication *
Association, *
 *

   Intervenors on Appeal, *
 *

Commercial Internet Exchange *
Association, *
 *

   Amicus Curiae. *


_____


No.  97-3720
_____


BellSouth Corportion; BellSouth Tele- *
communications, Inc., *
 *

   Petitioners, *
 *

Texas Office of Public Utility Counsel; *
Rural Telephone Coalition; United *

States Telephone Association; Missouri    *
Public Service Commission,    *

       *

       Intervenors on Appeal,    *

       *

       v.    *

       *

Federal Communications Commission;    *
United States of America,    *

       *

       Respondents,    *

       *

WorldCom, Inc.; American Telephone    *
and Telegraph Company; Tele-    *
communications Resellers Association;    *
Association for Local Tele-    *
communications Services; Sprint    *
Corporation; Ad Hoc Tele-    *
communications Users Committee;    *
National Cable Television Association;    *
Internet Access Coalition; Information    *
Technology Association of America;    *
The Competition Policy Institute; Excel    *
Telecommunications, Inc.; Telco    *
Communications Group, Inc; Time    *
Warner Communications Holdings,    *
Inc.; MCI Telecommunications    *
Corporation; Bell Atlantic Telephone    *
Companies; New York Telephone    *
Company; New England Telephone and    *
Telegraph Company; Ameritech    *
Corporation,    *

       *

       Intervenors on Appeal,    *

       *

------------------------------    *

       *

-25-

America's Carriers Telecommunication        *
Association,                                 *
                                             *
            Intervenors on Appeal,           *
                                             *
                                             *
Commercial Internet Exchange                 *
Association,                                  *
                                             *
            Amicus Curiae.                    *

_____

Submitted:  January 15, 1998
Filed:   August 19, 1998
_____

Before BOWMAN[1], WOLLMAN, and HANSEN, Circuit Judges.
_____

BOWMAN, Circuit Judge.

In these consolidated cases,[2] referred to this Court by order of the Judicial Panel on Multidistrict Litigation, numerous petitioners challenge an order of the Federal

_____

[1]The Honorable Pasco M. Bowman became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 18 1998.

[2]Opening briefs have been filed by four petitioners or groups of petitioners:  (1) BellSouth Corp, Cincinnati Bell Telephone Co., Southwestern Bell Telephone Co., and U S WEST, Inc. (collectively referred to as the "BellSouth petitioners"); (2) Bell Atlantic and intervenor Ameritech Corp. (collectively referred to as the "Bell Atlantic parties"); (3) MCI Telecommunications Corp., Cable & Wireless, Inc., and LCI International Telecom Corp. (collectively referred to as "the IXC petitioners"); and (4) the Texas Office of Public Utility Counsel ("Texas Counsel").  We also have received briefs from numerous intervenors, some supporting the petitioners, some supporting the Commission, and some of shifting allegiance depending upon the issue under discussion.

Communications Commission ("FCC" or "Commission") issued pursuant to the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (to be codified as amended in scattered sections of 47 U.S.C.) [hereinafter Act or 1996 Act], revising the regulatory scheme under which local exchange carriers ("LECs") assess costs to long-distance ("IXCs") and other carriers for use of the LECs' local telephone networks to complete interstate telephone calls, see In re Access Charge Reform; Price Cap Performance Review for Local Exchange Carriers; Transport Rate Structure and Pricing; End User Common Line Charges, First Report and Order (CC Docket Nos. 96-262, 94-1, 91-213, 95-72), FCC 97-158, 12 FCC Rcd No. 27 15982 (released May 16, 1997) [hereinafter Order]. Petitioners contend that various specific actions taken by the FCC in the Order that directly affect the application and calculation of access charges are in violation of the 1996 Act, and that other decisions made the by FCC in the Order are arbitrary and capricious. The IXCs argue generally that the Order does not make the transition to competitive access rates quickly enough and is too cautious in its concern for universal service. The incumbent LECs, on the other hand, argue that the FCC was insufficiently cautious with respect to protecting universal service and left them exposed to inefficient competitive entry in the short term.

The FCC counters that the challenged provisions of the Order are the result of a reasonable exercise of its authority to regulate rates for interstate services under the Telecommunications Act of 1996, and are not arbitrary and capricious. The FCC contends that it charted a proper middle course, "taking account of the complementary but sometimes diverging goals of competition and universal service support." FCC Brief at 37.

We review agency action under the Administrative Procedure Act to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A) (1994), rejecting only such administrative constructions of the law as are "contrary to clear congressional intent," Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n.9 (1984).

-27-

We are mindful "that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." Id. at 844. Where, as here, Congress has specifically assigned to the administrative agency the responsibility of interpreting and administering the statute at issue, "[t]he Supreme Court has many times made clear that this sort of question of law is for the agency to decide, so long as its interpretation of the statute is reasonable," City of St. Louis v. Department of Transp., 936 F.2d 1528, 1533 (8th Cir. 1991). The question for this Court is not whether there might have been a better way for the agency to resolve the conflicting issues with which it was faced, but whether the agency's choice is a reasonable one. See MCI Telecomms. Corp. v. FCC, 675 F.2d 408, 413 (D.C. Cir. 1982). Bearing in mind our considerably deferential standard of review, we address the contentions of each petitioner or group of petitioners in order. For the sake of simplicity, we will not attempt to identify the intervenors who have joined in the arguments made by either the petitioners or the FCC except in the case of Bell Atlantic and Ameritech Corporation, who filed a joint brief.

## I. The BellSouth Petitioners

The BellSouth petitioners contend that the Order violates 47 U.S.C.A. § 254 (West Supp. 1998)[3] (1) by failing immediately to remove all implicit subsidies[4] from interstate access charges, in contravention of the requirement that the mechanisms to implement universal service support be "specific [and] predictable," 47 U.S.C.A.

---

[3]All references in this opinion to sections and subsections of the Telecommunications Act of 1996 in West's United States Code Annotated (U.S.C.A.) are to the 1998 supplement.

[4]An implicit subsidy occurs when "a single company is expected to obtain revenues from sources at levels above 'cost' . . . and to price other services allegedly below cost." In re Federal-State Joint Board on Universal Service, First Report and Order (CC Docket No. 96-45), FCC 97-157 12 FCC Rcd No. 16 8776 ¶ 10 n.15 (released May 8, 1997) [hereinafter Universal Service Order], petitions for review pending, Texas Office of Pub. Util. Counsel v. FCC, 5th Cir. No. 97-60421.

§ 254(b)(5); (2) by neglecting to protect the implicit universal service support subsidies encompassed within interstate access charges from competition until a new universal service support regime is operational, in contravention of the requirement that the mechanisms to implement universal service support be "sufficient," id.; and (3) by continuing to impose on incumbent LECs, but not new entrants into the local exchange market, the obligation to support universal service through interstate access charges, in contravention of the requirement that contributions be "nondiscriminatory," id. § 254(b)(4). The FCC's actions, according to the BellSouth petitioners, will prevent LECs from recovering the costs of universal service support traditionally included as implicit subsidies within interstate access charges and will unfairly burden incumbent LECs with the costs of universal service support while exempting new entrants into the market from bearing their share of these costs.

## A.  Immediate Replacement of Existing System

The BellSouth petitioners first argue that the Commission's Order violates the statutory mandate of § 254 that all "mechanisms to preserve and advance universal service subsidies" be "specific" and "predictable." Id. § 254(b)(5). By delaying the implementation of a new regime of explicit universal service subsidies until at least January 1, 1999,[5] while at the same time promoting immediate competition in the local exchange market as a means of bringing access charges more closely in line with actual costs, the BellSouth petitioners contend that the FCC has ensured that universal service support subsidies will be detrimentally deflated to such an extent that they will cease to serve their purpose.

---

[5]The FCC has delayed implementation of a new, explicit regime for universal service support until at least January 1, 1999 and has concluded that, until the new fund is operational, "the existing system of largely implicit subsidies" will have to "continue to serve its purpose." Universal Service Order ¶ 17.

The FCC replies that changes to interstate access charges made in the Order are well within the discretionary authority granted to the Commission by Congress to implement the policies of the 1996 Act, including the promotion of competition in the local exchange market, the elimination of implicit universal service support subsidies, and the preservation of universal service. The Commission argues specifically that its decision to open local exchange markets to competition in compliance with 47 U.S.C.A. § 251(d) (requiring completion by August 1996 of regulations to implement market opening provisions) prior to the full implementation of a new, explicit regime of universal service support pursuant to § 254, is permissible under the 1996 Act. By its specific language, the Act contemplates sequential implementation of, initially, the market opening provisions of § 251, followed by the new explicit universal service support mechanisms of § 254. The decision to promote competition in the local exchange market prior to the enactment of a new universal support mechanism is therefore reasonable, according to the FCC.

We agree that the FCC's decision to adjust the computation of interstate access charges to eliminate implicit subsidies and promote competition in the local exchange market before an explicit universal service support mechanism is fully operational is reasonable in light of the specific language of the 1996 Act. Section 251(d)(1) required the Commission to adopt rules implementing the market opening provisions by August 1996. Section 254(a)(2), however, did not require the FCC to adopt universal service rules until May 1997. See id. ("The Commission shall initiate a single proceeding to implement the recommendations from the [the Federal-State] Joint Board [on universal service] . . . and shall complete such proceeding within 15 months after February 8, 1996."). The Act does not require that the rules promulgated under § 254 immediately implement a new, explicit universal service support mechanism. Rather, the rules enacted by the FCC must establish "a specific timetable for implementation." Id. By establishing an explicit universal service support regime in the In re Federal-State Joint Board on Universal Service, First Report and Order (CC Docket No. 96-45), FCC 97-157, 12 FCC Rcd No. 16 8776 (released May 8, 1997) [hereinafter Universal

Service Order], petitions for review pending, Texas Office of Public Utility Counsel v. FCC, 5th Cir. No. 97-60421, that will be fully operational by January 1999, the Commission has proceeded in a manner contemplated by the Act. The Commission has made a predictive judgment, based on evidence in the record and adequately explained in the Order, that competitive pressures in the local exchange market will not threaten universal service during the interim period until the permanent, explicit universal service support mechanism has been fully implemented. See City of St. Louis, 936 F.2d at 1534 ("Such forecasts must be accepted 'if they are rational, based on a consideration of all the relevant factors, and adequately explained.'") (citations to quoted cases omitted).

The Commission's decision to promote competition in the local exchange market and eliminate implicit subsidies embedded in interstate access charges prior to the full implementation of a new, explicit mechanism for universal service support does not violate the provisions of the 1996 Act, nor does it represent an unreasonable interpretation of the Act.

## B. New Implicit Subsidies and Erosion

The BellSouth petitioners further argue that the FCC, in addition to delaying impermissibly the implementation of an explicit universal service support mechanism, has created new implicit subsidies in violation of the 1996 Act while, at the same time, exposing these subsidies to competitive forces that will render them ineffective.

The BellSouth petitioners first take issue with the FCC's decision to maintain the flat-rated (as opposed to per-minute) subscriber line charge ("SLC") ceiling of $3.50 per month on primary residential lines while increasing the SLC ceiling for both non-primary residential lines and multi-line business lines. See Order ¶ 78 (raising the multi-line business line SLC ceiling to $9.00 per month and allowing an increase of up to $1.50 per month in the non-primary residential line SLC ceiling beginning January 1, 1998 with additional phased-in increases in the future). According to the BellSouth

petitioners, preserving the current SLC cap on primary residential lines prevents LECs from recovering the costs associated with serving those lines, while increasing the SLC cap on non-primary and multi-line business lines above actual cost forces users of these lines to subsidize expenses associated with the under-funded primary residential lines. The ultimate result of these changes is the creation of a new, implicit subsidy funded by the increased rate ceilings on customers with non-primary residential or multi-line business lines and benefiting customers with only primary residential lines. This, according to the BellSouth petitioners, is in direct contravention of § 254's directive that support for universal service be "explicit." 47 U.S.C.A. § 254(e).

We cannot agree that the FCC's decisions to increase SLCs on non-primary residential and multi-line business lines and to maintain the current ceiling on primary residential lines are in violation of the 1996 Act. The Commission, relying on recommendations from the Federal-State Universal Service Joint Board[6] [hereinafter Joint Board], justifiably determined that an increase in the SLC ceiling for primary residential lines would threaten universal service in ways that an increase in the SLC ceiling for non-primary residential and multi-line business lines simply would not. See Order ¶ 70 (noting Joint Board's conclusion that "the SLC . . . has an impact on universal service concerns such as affordability" and its recommendation "that the Commission leave the current SLC ceilings in place for primary residential and single-line business lines"). The courts have recognized that universal service concerns are valid justifications for FCC action. See, e.g., Competitive Telecomms. Ass'n v. FCC, 117 F.3d 1068, 1074 (8th Cir. 1997); Rural Tel. Coalition v. FCC, 838 F.2d 1307, 1315 (D.C. Cir. 1988); National Ass'n of Regulatory Util. Comm'rs v. FCC, 737 F.2d 1095, 1108 (D.C. Cir. 1984), cert. denied, 469 U.S. 1227 (1985). While the FCC

_____

[6]Except for mandatory referral of proceedings regarding jurisdictional separations, the FCC "may refer any matter arising in the administration of this chapter to a joint board" comprised of agency representatives and representatives of States in which the proposed regulation will have effect. 47 U.S.C. § 410(a) (1994).

acknowledges that its decisions regarding SLC ceilings "will require customers with multiple telephone lines to contribute, <u>for a limited period</u>, to the recovery of common line costs that incumbent LECs incur to serve single-line customers," <u>Order</u> ¶ 101 (emphasis added), we note that this temporary, transitional arrangement is not an unreasonable solution to the implicit tension between the FCC's goals of moving toward cost-based rates and protecting universal service, <u>see</u> <u>Competitive Telecomms.</u>, 117 F.3d at 1073-74 ("Although temporary agency rules are subject to judicial review notwithstanding their transitory nature, 'substantial deference by courts is accorded to an agency when the issue concerns interim relief.'") (quoting <u>MCI Telecomms. Corp. v. FCC</u>, 750 F.2d 135, 140 (D.C. Cir. 1984)); <u>City of St. Louis</u>, 936 F.2d at 1543 ("[T]he weighing of one public-interest factor against another is preeminently a function for an expert agency, not a court.").

Furthermore, as the FCC points out, the decision to retain the $3.50 per month SLC ceiling on primary residential lines was made in conjunction with the introduction of a flat-rated presubscribed interexchange carrier charge ("PICC"), assessed directly on IXCs rather than on users to recoup costs not covered by the SLC, that will increase incrementally until the SLC and PICC combined recover all costs associated with primary residential lines. <u>See</u> <u>Order</u> paras. 94, 99 (imposing PICC on primary residential and single-line business lines at a maximum of $0.53 per month, on non-primary residential lines at a maximum of $1.50 per month, and on multiple business lines at a maximum of $2.75 per month). Upon completion of the Commission's phased-in plan of PICC ceiling increases on primary residential lines (combined with corresponding PICC cap decreases on multi-line business lines), the aggregate flat-rated charges (the combination of both SLC and PICC) imposed upon primary residential lines will be the same per line as those imposed upon multi-line business lines. <u>See</u> <u>id.</u> ¶ 102.

For the reasons stated, we conclude that the FCC's decision to maintain the current SLC ceiling on primary residential lines does not amount to the creation of a

new implicit subsidy for the benefit of primary residential line customers and to the detriment of non-primary line and multi-line business line customers, in violation of § 254's direction that subsidies be "explicit."

## C.  Originating Minutes

Both the BellSouth petitioners and the Bell Atlantic parties challenge the FCC's actions with respect to the imposition of per-minute charges on originating access minutes.  They contend that the requirement to recoup non-traffic-sensitive costs not fully recovered under the flat-rated SLC and PICC price ceilings by applying a per-minute access carrier common line charge ("CCLC") and a per-minute residual transport interconnection charge ("TIC") assessed on <u>originating</u> access minutes (charges imposed on carriers for outgoing calls), rather than on  <u>terminating</u> access minutes, is in violation of the 1996 Act.  They argue that the higher degree of competition for originating access minutes will prevent them from imposing the CCLC or the TIC to recoup costs lest they risk losing customers to competitors who can undercut their prices.  This approach, according to the BellSouth petitioners, is inherently discriminatory--it places a disproportionate burden of paying for universal service support on incumbent LECs in violation of the Act.  <u>See</u> 47 U.S.C.A. § 254(b)(4) ("All providers of telecommunications services should make an equitable and nondiscriminatory contribution to . . . universal service.").  Furthermore, the BellSouth  petitioners and the Bell Atlantic parties argue, the Commission's decision to employ a per-minute charge to recover non-traffic-sensitive, or flat, costs is contrary to the agency's stated goal of imposing access charges in a cost-causative manner--"in a way that reflects the way the costs are incurred."  <u>Order</u> <u>passim</u>.

The Commission defends its decision to allow recovery of non-traffic-sensitive residual costs through per-minute access charges as an interim solution that will be phased out as flat-rated PICC caps increase to allow for such recovery.  <u>See id.</u> ¶ 102. Prior to the changes implemented in the Order, these residual costs were recovered through per-minute charges assessed on both originating and terminating access

minutes. The Commission, realizing that greater competition would exist for provision of originating rather than terminating access minutes, determined that recovery of these residual costs on originating minutes would promote the agency's objective of allowing the marketplace to move LECs' access rates toward competitive levels. See id. ¶ 100. The decision to continue employing a traffic-sensitive mechanism to recover these non-traffic-sensitive costs is justified by universal service concerns. Until flat-rated PICC ceilings rise sufficiently over time to allow recovery of these residual, non-traffic-sensitive costs, the FCC has opted to maintain the non-cost-causative, per-minute charges that, in addition to permitting recovery of otherwise lost residual costs, have the added advantage of promoting Congress's goal of moving access rates toward competitive levels. As the Commission points out, a phased-in transition from non-cost-causative per-minute rates to cost-causative flat rates has been adopted in the Order.

We find that the Commission's decision to impose the residual per-minute CCLC and TIC on originating, rather than terminating, access minutes is not in violation of the 1996 Act. This transitional solution is a reasonable exercise of the Commission's discretionary authority to balance competing statutory goals. See National Ass'n of Regulatory Util. Comm'rs, 737 F.2d at 1134 (noting that FCC has broad "statutory discretion to balance the multiple goals embodied in the Communications Act"). Rather than jeopardize universal service support by immediately eliminating any per-minute charges currently associated with flat costs, the FCC elected to eliminate these non-cost-causative charges over time, gradually increasing the flat-rated PICC to levels necessary to recoup these residual costs. "The shift from one type of nondiscriminatory rate structure to another may certainly be accomplished gradually to permit the affected carriers, subscribers and state regulators to adjust to the new pricing system, thus preserving the efficient operation of the interstate telephone network during the interim." Id. at 1135-36. We cannot conclude that this solution is contrary to the 1996 Act.

Furthermore, we cannot second-guess the FCC's decision to impose the CCLC and the TIC on originating access minutes. The 1996 Act was intended to encourage competition in the telecommunications market, and the Commission's determination that the above transitional method of accounting for residual costs would increase competition and move costs toward competitive levels is a reasonable one. See Competitive Telecomms., 117 F.3d at 1073-75 (according substantial deference to transitional plan to preserve universal service). "It is not the Commission's chore to convince us that what it has done is the best that could be done, but that what it has done is reasonable under difficult circumstances." National Ass'n of Regulatory Util. Comm'rs, 737 F.2d at 1141.

## D.  Extension of Implicit Subsidies to Purchasers of Unbundled Networks

The BellSouth petitioners next argue that the Commission's decision to exempt purchasers of unbundled network elements ("UNEs") from contributing to universal service support through interstate access charges represents an arbitrary and capricious reversal of agency policy and is contrary to § 254's requirement that contributions to universal service support be equitable and nondiscriminatory.

After passage of the 1996 Act, the Commission initially determined that purchasers of UNEs would be required to contribute to universal service by paying a portion of access charges, i.e., the entire CCLC and seventy-five percent of the TIC, until the new universal service support mechanism was fully operational. See In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996; Interconnection between Local Exchange Carriers and Commercial Mobile Radio Service Providers, First Report and Order (CC Docket Nos. 96-98, 95-185), FCC 96-325, 11 FCC Rcd No. 28 15499 ¶ 720 (released August 8, 1996) [hereinafter Local Competition Order], petition denied in part and order vacated in part, Competitive Telecomms. Ass'n, 117 F.3d at 1068 (addressing only CC Docket No. 96-98). The FCC reasoned that new entrants into the local service market otherwise could avoid contributing to universal service support "by serving their local customers

-36-

solely through the use of unbundled network elements rather than through resale," thereby circumventing imposition of access charges. Id. ¶ 719. The Commission's decision to permit the imposition of some interstate access charges on UNE purchasers, however, was explicitly time-limited and expired on June 30, 1997. See Order ¶ 339.

As the BellSouth petitioners acknowledge, the FCC created a general exemption from the assessment of access charges by LECs on purchasers of UNEs, and permitted LECs to assess the CCLC and seventy-five percent of the TIC from such purchasers until June 30, 1997, see 47 C.F.R. § 51.515(a)-(b) (1997). The BellSouth petitioners cannot now complain that passage of the expiration date for this temporary exception and the consequent termination of its application signifies an abrupt change in FCC policy. In fact, the FCC emphasized in the Local Competition Order that it could "conceive of no circumstances" under which the temporary assessment of access charges on UNE purchasers would be extended beyond June 30, 1997. Local Competition Order ¶ 725. That the FCC has now made good on its promise to exempt purchasers of UNEs from access charges should come as no surprise to the BellSouth petitioners.

Nor is the Commission's decision to exempt purchasers of UNEs from access charges that are imposed by incumbent LECs in contravention of § 254's directive to ensure equitable and nondiscriminatory contributions to universal service support. The BellSouth petitioners argue that allowing UNE purchasers access to their networks without the imposition of access charges guarantees discriminatory and inequitable contribution to universal service support by LECs who must continue to contribute, despite their inability to collect a fair contribution from UNE purchasers. As the FCC has explained, however, "payment of cost-based rates represents full compensation to the incumbent LEC for use of the network elements that carriers purchase. . . . Allowing incumbent LECs to recover access charges in addition to the reasonable cost of such facilities would constitute double recovery because the ability to provide access

-37-

services is already included in the cost of the access facilities themselves."  Order ¶ 337.

The FCC specifically addresses in the Order the BellSouth petitioners' argument that access charges should be imposed on UNEs because charging only cost-based rates for such elements will not allow the providers to recover universal service support subsidies, which are implicitly built into the access charge regime.  The FCC points out that purchasers of UNEs will contribute to universal service pursuant to § 254--they receive no exemption from universal service support obligations by purchasing UNEs. See Order ¶ 338.  Furthermore, having observed the market-opening provisions of the 1996 Act in operation for ten months, the FCC has predicted that an extension of the temporary application of interstate access charges to purchasers of UNEs is not necessary to protect the universal service support system from marked losses.  According to the FCC, purchasers of UNEs are "providing no more than a de minimis share of industry-wide access service[s]."  In re Access Charge Reform; Price Cap Performance Review for Local Exchange Carriers; Transport Rate Structure and Pricing; End User Common Line Charges, Order (CC Docket Nos. 96-262, 94-1, 91-213, 95-72), FCC 97-216, 12 FCC Rcd No. 17 10175 ¶ 15 (released June 18, 1997).  It is not unreasonable for the FCC to conclude that, given the relatively insignificant headway UNE purchasers have made in the telecommunications market, universal service will not be threatened by the exemption of UNE purchasers from access charges.  The Commission also has explained that rate structure modifications adopted in the Order will allow incumbent LECs to recover costs, including those associated with universal service support obligations.  See Order ¶ 338.

We conclude that the Commission's decision to exempt purchasers of UNEs from interstate access charges is not an arbitrary and capricious departure from statutory standards, nor has the FCC violated its statutory mandate to ensure contributions to universal service that are equitable and nondiscriminatory.

Consequently, we will defer to the agency's expertise and leave intact its decision regarding the imposition of interstate access charges on purchasers of UNEs.

## E. Permanent Exemption for ISPs

Finally, the BellSouth petitioners, joined by the Bell Atlantic parties,[7] argue that the Commission's decision to grant information service providers[8] ("ISPs") an exemption from interstate access charges creates a new, implicit, and discriminatory subsidy in violation of the 1996 Act; impermissibly forces state regulators to set rates for the recovery of interstate costs; and converts a transitional access charge exemption for ISPs into a permanent one. The FCC denies these assertions and contends that its determination to prohibit the assessment of interstate access charges on ISPs is a reasonable one under the 1996 Act.

The BellSouth petitioners initially maintain that the FCC's refusal to extend interstate access charges to ISPs constitutes a new, implicit, and discriminatory subsidy in violation of § 254. They assert that the exemption excuses ISPs from paying the access charges associated with their traffic over the LECs' local networks. Their argument is that the FCC's explanation for this decision--avoiding the disruption of an evolving industry--cannot justify acting in violation of the 1996 Act. The FCC, on the other hand, argues that it did not create a new, implicit, and discriminatory subsidy by declining to extend to ISPs (which never have paid per-minute access rates under the old rules) a rate structure that, as a result of the transition into universal service support funded solely through explicit subsidies, unavoidably includes residual implicit subsidies. See Order ¶ 345. We agree that the FCC's decision to exempt ISPs from

---

[7]The BellSouth petitioners, except for GTE, which takes no position, endorse the arguments made by the Bell Atlantic parties on this issue.

[8]Information service providers previously were referred to in FCC regulations and in cases as "enhanced service providers," or "ESPs."

interstate access charges while continuing to investigate potential future changes in this area is a reasonable exercise of the agency's discretion under the 1996 Act.

Initially we note that the FCC has maintained the same position for the past fourteen years, refusing to permit the assessment of interstate access charges on ISPs. See In re Amendments of Part 69 of the Commission's Rules Relating to the Creation of Access Charge Subelements for Open Network Architecture; Policy and Rules Concerning Rates for Dominant Carriers, Report and Order (CC Docket Nos. 89-79, 87-313), FCC 91-186, 6 FCC Rcd No. 15 4524 ¶ 60 (released July 11, 1991) (noting that access system in which ISPs do not pay interstate per-minute charges is the "status quo"). Furthermore, the Commission's actions do not discriminate in favor of ISPs, which do not utilize LEC services and facilities in the same way or for the same purposes as other customers who are assessed per-minute interstate access charges.[9] As this Court noted in Competitive Telecommunications, even where two different sets of carriers seek to use LEC network services and facilities that might be "technologically identical," the services and facilities provided by the LEC are "distinct" if the carriers are making different uses of them. 117 F.3d at 1073. Consequently, different regulatory treatment of LEC services and facilities in such circumstances does not have "a discriminatory impact." Id. Here, we agree with the FCC that "it is not clear that ISPs use the . . . network in a manner analogous to IXCs," Order ¶ 345, and conclude, therefore, that the Commission's refusal to impose access charges on ISPs does not violate § 254's requirement that contributions to universal service be nondiscriminatory.

---

[9]ISPs subscribe to LEC facilities in order to receive local calls from customers who want to access the ISP's data, which may or may not be stored in computers outside the state in which the call was placed. An IXC, in contrast, uses the LEC facilities as an element in an end-to-end long-distance call that the IXC sells as its product to its own customers.

Neither does the Commission's decision to exempt ISPs from interstate access charges violate § 254(e)'s requirement that "explicit" support mechanisms for universal service be implemented. The Universal Service Order outlines the FCC's plan for eradicating implicit subsidies. Section 254, as we previously have discussed, does not require the immediate elimination of implicit subsidies, only the establishment of a specific timetable to move from implicit to explicit universal service support subsidies. We conclude that the Commission's decision to exempt ISPs from interstate access charges does not constitute the creation of a new, implicit, and discriminatory subsidy in contravention of the 1996 Act.

The petitioners also argue that there are uncompensated costs associated with the LECs' service to ISPs. The FCC, however, was not convinced of the alleged shortfalls, and identified sources of revenue that are available to the LECs to cover the interstate costs generated by the ISPs. See Order ¶ 346. The FCC has made a rational choice regarding the treatment of ISPs from a number of alternatives that are each imperfect. When an agency has gone to considerable lengths to amass information, sift through the record for pertinent facts, and reach a temporary conclusion, it has not acted arbitrarily or capriciously.

The BellSouth petitioners and the Bell Atlantic parties next allege that the interstate access charge exemption for ISPs impermissibly requires state regulatory commissions to recover interstate costs. They argue that "[t]here is no question" that ISPs, like IXCs, use the local network to provide interstate services. Bell Atlantic Brief at 12. Moreover, they argue that there is no dispute that the interstate costs imposed on LECs by these services have increased dramatically in recent years as a result of the expansion of traffic on the Internet. The LECs contend that, as a result of this increased traffic, they have been required to spend "billions of dollars to enhance network capacity." Id. at 13. While the increased burdens on local networks generate, according to the BellSouth petitioners and Bell Atlantic parties, "undeniably interstate costs," they complain that the ISP access charge exemption precludes recovery of the

majority of those costs.  Id.  Instead, ISPs, which are classified as end users, "may purchase services from incumbent LECs under the same intrastate tariffs available to end users," without paying equitable rates to compensate LECs for the increased costs associated with the services provided.  Order ¶ 342.  The petitioners contend that the FCC's suggestion that LECs "address their concerns to state regulators," amounts to a dereliction of the Commission's obligation to retain exclusive jurisdiction over interstate communications and forces state regulatory commissions to overstep their authority by recovering interstate costs.  Id. ¶ 346 ("To the extent that some intrastate rate structures fail to compensate incumbent LECs adequately for providing service to customers with high volumes of incoming calls, incumbent LECs may address their concerns to state regulators.").

We disagree with the petitioners' characterization of the manner in which ISPs utilize the local network and thereby generate interstate costs susceptible to FCC regulation.  See id. ¶ 343 (noting that FCC "tentatively concluded" in notice of proposed rulemaking that "ISPs should not be subjected to an interstate regulatory system designed for circuit-switched interexchange voice telephony solely because ISPs use incumbent LEC networks to receive calls from their customers.").  Contrary to the petitioners' assertions, there is some disagreement as to the manner in which ISPs make use of the local network.  As the FCC argues, the services provided by ISPs may involve both an intrastate and an interstate component and it may be impractical if not impossible to separate the two elements.  See California v. FCC, 905 F.2d 1217, 1244 (9th Cir. 1990).  Consequently, the FCC has determined that the facilities used by ISPs are "jurisdictionally mixed," carrying both interstate and intrastate traffic.  FCC Brief at 79.  Because the FCC cannot reliably separate the two components involved in completing a particular call, or even determine what percentage of overall ISP traffic is interstate or intrastate, see id. (noting that at least some ISP services are purely intrastate and not susceptible to FCC regulation), the Commission has appropriately exercised its discretion to require an ISP to pay intrastate charges for its line and to pay the SLC (which has been increased in the Order to cover a greater proportion of

-42-

interstate allocated loop costs), but not to pay the per-minute interstate access charge. The states are free to assess intrastate tariffs as they see fit. In these circumstances, we cannot say that the FCC has shirked its responsibility to regulate interstate telecommunications, nor can we conclude that it has directed the States to inflate intrastate tariffs to cover otherwise unrecoverable interstate costs, thereby exceeding its statutory authority. See Iowa Utils. Bd. v. FCC, 120 F.3d 753, 796 (8th Cir. 1997) (holding that FCC lacks authority to determine intrastate rates), cert. granted, 118 S. Ct. 879 (1998).

Moreover, the FCC has not issued its final determination with regard to the treatment of ISPs. As noted in the Order, the Commission has initiated a Notice of Inquiry ("NOI") to investigate further what changes, if any, should be made with regard to the regulation of ISPs. See Access Charge Reform; Price Cap Performance Review for Local Exchange Carriers; Transport Rate Structure and Pricing; Usage of the Public Switched Network by Information Service and Internet Access Providers, Proposed Rule (CC Docket Nos. 96-262, 94-1, 91-213, 96-263), FCC 96-488, 62 Fed. Reg. 4670, 4712-13 (1997) (to be codified at 47 C.F.R. pts. 61 and 69).

> In the *NOI*, we will address a range of fundamental issues about the Internet and other information services, including ISP usage of the public switched network. The *NOI* will give us an opportunity to consider the implications of information services more broadly, and to craft proposals for a subsequent NPRM [Notice of Proposed Rulemaking] that are sensitive to the complex economic, technical, and legal questions raised in this area.

Order ¶ 348 (footnote omitted). The FCC thus has not foreclosed the possibility that ISPs will be subjected to additional regulation under a scheme yet to be determined. To the extent that the BellSouth petitioners and the Bell Atlantic parties complain about the ISPs' uncompensated burden on their local networks, they, as well as other LECs, are welcome to address their continued concerns to the FCC through the NOI process.

Finally, the BellSouth petitioners and the Bell Atlantic parties argue that the FCC has permanently abandoned its stated policy that all those who use the local telephone networks to provide interstate services should bear their fair share of interstate access charges. The petitioners cite Competitive Telecommunications Association v. FCC, 87 F.3d 522 (D.C. Cir. 1996) (CompTel),[10] as support for their position that ISPs should be subject to interstate access charges. In the 1983 Access Charge Order at issue in CompTel, the FCC had instituted transitional rules favoring smaller long-distance carriers in an effort to promote competition in the long-distance market. These transitional rules were extended by the Commission for thirteen years under the justification that sufficient cost information necessary to determine appropriate rates was not yet developed. The D.C. Circuit struck down the rules acknowledging that, while the FCC is not required to impose purely cost-based rates for all services, it must "specially justify any rate differential that does not reflect cost." Id.

The facts in CompTel are distinguishable from the facts with which we are faced here. In CompTel, the FCC was imposing inconsistent, allegedly transitional rates on entities--incumbent long-distance carriers and smaller long-distance carriers--that essentially provided identical services. Here, the FCC is exempting from interstate access charges ISPs that, according to the FCC, utilize the local networks differently than do IXCs. The FCC has justified its decision to exempt ISPs from access charges paid by IXCs by noting the distinction between the manner in which these separate entities utilize the local networks. See, e.g., Order ¶¶ 343, 345.

_____

[10]Because of the transfer of the present cases to this Court, the D.C. Circuit denied as moot AT&T's motion to enforce the mandate in Competitive Telecommunications Association v. FCC, 87 F.3d 522 (D.C. Cir. 1996). See Competitive Telecomms. Ass'n v. FCC, Nos. 95-1168, 95-1170, 97-1678, 97-1681, 1998 WL 135461 (D.C. Cir. Feb. 20, 1998).

The FCC explained in the Order that "[m]aintaining the existing pricing structure for [ISP] services avoids disrupting the still-evolving information services industry and advances the goals of the 1996 Act to 'preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation.'" Order ¶ 344 (footnote omitted) (quoting 47 U.S.C.A. § 230(b)(2)). The Commission reasonably has exercised its discretion in evaluating the relevant data and in concluding that, at least for the present, ISPs should be excluded from the imposition of interstate access charges. We will overturn an agency rule as arbitrary and capricious only "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). We find no such fault with the Commission's decision and we decline to interfere with the FCC's determination to grant ISPs an exemption from interstate access charges.

## II. Bell Atlantic Parties

The Bell Atlantic parties argue that the FCC acted arbitrarily, abandoning its long-held position to the contrary, when it announced in the Order that LECs subject to price-cap regulation must adjust their price-cap indices downward to reflect the completed amortizations of extraordinary, one-time equal access conversion expenses. While it is true that this decision marks a change in course by the FCC, such a change, if satisfactorily explained, is permissible. Cf. id. at 57 (reversing agency action and noting that agency failed to explain its decision). Because we are satisfied that the Commission has adequately justified its changed position and its decision to require this downward adjustment, we conclude that the FCC has not acted arbitrarily.

In 1985, the FCC directed that certain expenses associated with equal access conversion, ordinarily fully accounted for in the year in which the expenses were

incurred, be identified separately and amortized over a period of eight years, ending December 31, 1993.[11] See In re Petitions for Recovery of Equal Access and Network Reconfiguration Costs, Memorandum Opinion and Order FCC No. 86-470, 1 FCC Rcd No. 3 434, ¶ 25 (released Nov. 5, 1986) [hereinafter Petitions for Recovery of Equal Access Costs].  On January 1, 1991, during the recovery period for these equal access conversion expenses, the FCC converted from rate of return regulation to price-cap regulation.  In conjunction with this conversion, the FCC chose a set of "baseline" rate levels, those in effect on July 1, 1990, to which the price-cap indices were tied as the starting point for measuring subsequent incremental cost changes.  See In re Policy and Rules Concerning Rates for Dominant Carriers, Second Report and Order (CC Docket No. 87-313) FCC 90-314, 5 FCC Rcd No. 23 6786, ¶ 230 (released Oct. 4, 1990) [hereinafter LEC Price Cap Order], petitions dismissed, National Rural Telecom Ass'n v. FCC, 988 F.2d 174 (D.C. Cir. 1993).  The one-time equal access expenses that would have been recovered in the same year in which they were incurred were reflected in these 1990 baseline figures, resulting in an artificially high starting point from which the FCC allowed subsequent increases.  The FCC now concedes that, in prior decisions, it has not addressed properly the question of whether equal access expenses that were embedded within original baseline rates pursuant to the one-time amortizations should have been removed through downward adjustments when the amortizations expired.  In the Order, however, the FCC reversed the position it had taken on this issue and determined that price-cap LECs should be required to make downward price-cap adjustments to reflect the expiration of their equal access expense amortizations.  See Order ¶ 309.  The FCC likened the equal access amortizations to the depreciation reserve deficiency and inside wiring cost amortizations that "were given exogenous cost treatment when they expired because they reflected temporary, one-time treatment of costs under ROR [rate of return] regulation that, due to the mid-

---

[11]The FCC required amortization of these expenses out of "concern[] that these expenditures will cause irregular and substantial fluctuations in revenue requirements associated with equal access."  Equal Access and Network Reconfiguration Costs, FCC 85-628, 50 Fed. Reg. 50910, 50914-15 ¶ 33 (Dec. 13, 1985).

stream switch to price-cap regulation, would have become permanent (even though the costs already had been recovered) absent an exogenous cost adjustment." Id. ¶ 310.

The Bell Atlantic parties first claim that the equal access amortizations cannot be compared to the depreciation reserve deficiency and inside wiring amortizations because the costs associated with the latter amortizations were incurred entirely before the switch to price-cap regulation, while LECs continued to incur equal access costs after the price-cap regime commenced. As the FCC explained, however, the amortized costs in all three instances were extraordinary[12] and were reflected in the baseline rate levels adopted by the FCC as the starting point from which future adjustments would be made. As the FCC explained when it categorized these expenses as extraordinary, they are distinguishable from "normal recurring expenses" due to the "unusually high concentration of expenses . . . incurred over a limited time." Petitions for Recovery of Equal Access Costs ¶ 24; see also, Equal Access and Network Reconfiguration Costs, FCC 85-628, 50 Fed. Reg. 50910, 50914 ¶ 33 (Dec. 13, 1985); Order ¶ 300. We cannot conclude that the FCC improperly determined that the one-time equal access conversion amortizations should be subject to treatment similar to that accorded depreciation reserve deficiency and inside wiring amortizations.

The Bell Atlantic parties further criticize the FCC's decision to refuse an upward cost adjustment for "subsequent equal access costs," while requiring a downward cost adjustment to reflect the expiration of the original equal access conversion amortizations. Bell Atlantic Brief at 33. This argument, however, fails to acknowledge that the original conversion costs, unlike any subsequent costs, were extraordinary, one-time costs. Furthermore, the FCC categorizes "the ongoing costs of providing equal access as part of the normal costs of providing telephone service. Exogenous

---

[12]The FCC explains that these amortized costs were "extraordinary" in that "they did not reflect the 'normal' operation of rate of return regulation, but rather created aberrant spikes in rates, which would have returned to normal levels had rate of return regulation remained in effect." FCC Brief at 68 (citing Order ¶¶ 303-05).

treatment of these costs is unnecessary." Order ¶ 312. The FCC's refusal to allow an upward cost adjustment to account for ongoing costs associated with equal access is not arbitrary.

We conclude that the FCC's decision to require LECs to adjust their price-cap indices downward to reflect the completed amortizations of extraordinary, one-time equal access conversion expenses is neither arbitrary nor capricious. "[T]he mere change of an administrative opinion after a lawful reconsideration can hardly be arbitrary and capricious on its face." Southwestern Bell Tel. Co. v. FCC, 138 F.3d 746, 753 (8th Cir. 1998). Upon further reflection, the FCC determined that this downward adjustment, although rejected in past decisions, was an equitable and necessary one. As the Commission explained, "[R]atepayers should not be forced to pay for a cost that, were it not for the way price-cap regulation occurred in this instance, they would no longer be paying." Order ¶ 311. We cannot fault the Commission for reconsidering its position and ordering the necessary adjustment.

## III. IXC Petitioners
## A. Access Charges

The IXC petitioners argue that the Commission's decision not to lower interstate access charges to equal economic cost is arbitrary, capricious, and inconsistent with the FCC's responsibility to promulgate regulations that best serve the public interest. They contend that the existing access charge system, rife with non-cost-based rates and implicit subsidies, violates FCC precedent and various provisions of the 1996 Act. Furthermore, they claim that by adopting a market-based, rather than a prescriptive, approach to driving access rates toward economic costs, the Order fails to remedy the defects in the current system. The FCC, on the other hand, argues that the current system is lawful and that the market-based approach adopted in the Order represents a reasonable attempt to "shift from one type of [lawful regulatory system] to another. . . gradually to permit the affected carriers, subscribers and state regulators to adjust to the new pricing system." National Ass'n of Regulatory Util. Comm'rs, 737 F.2d at

-48-

1135-36 (upholding gradual shift to flat-rate end-user access charges in order to avoid excessively burdening carriers).

The IXC petitioners first argue that the FCC failed to provide a reasoned explanation for its decision to adopt a market-based approach to interstate access charge reform rather than a prescriptive approach under which the Commission sets rates at economic cost levels. The FCC's explanation for declining to prescribe access charge rates--the impracticability of developing a forward-looking cost model necessary to determine the economic costs of the services--is, according to the IXC petitioners, contrary to the Commission's position taken in an identical regulatory situation. The IXC petitioners contend that the FCC has directed states to determine the economic costs of certain unbundled network elements in order to develop a forward-looking cost model for local services to be used in determining universal service support needs. But see Iowa Utils. Bd., 120 F.3d at 793-800 (holding that FCC lacks jurisdiction to issue pricing rules for local telecommunications traffic, and vacating the provisions of the Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, CC Docket No. 96-98 (Aug. 8, 1996), that attempted to impose pricing rules on the states). The network elements involved in the local-services project are, according to the IXC petitioners, identical to those necessary to develop a reliable cost model for interstate access charges. Therefore, the IXCs contend, the FCC's assertion that it cannot develop the cost model necessary to establish prescriptive rates for interstate access charges is unavailing.

The FCC argues that the two projects are distinguishable and that its position in regard to access charges is supported by long recognized regulatory problems associated with the allocation of common costs that are not as prevalent in a determination of the economic costs of unbundled network elements. See, e.g., MCI Telecomms. Corp., 675 F.2d at 410. The Commission has explained that "separate telecommunications services are typically provided over shared network facilities, the costs of which may be joint or common with respect to some services." Local

-49-

<u>Competition Order</u> ¶ 678 (emphasis added). The FCC notes, for example, that the local loop is used to provide virtually all telephone services, but, in setting rates for the various services, regulations must allocate a portion of the common loop cost to each individual service that uses the loop. By contrast, unbundled network elements are generally treated as distinct facilities, the entire cost of which is reflected in the rate for that particular element. Due to the difficulty in creating a reliable forward-looking cost model for interstate access services, a prescriptive plan would not be feasible at the present time, even if the agency believed such a plan were preferable. We find that the FCC's explanation is an adequate, although perhaps not compelling, justification for its refusal to set prescriptive rates for interstate access service. Given our deferential standard of review, this is all that is required.

The IXC petitioners further argue that, even if the Commission's stated reason for rejecting prescribed cost-based rates was satisfactory, the FCC was required to explain why a market-based approach was likely to meet the public interest by lowering access charges to an amount equal to economic costs. Citing an absence of evidence that local telephone service markets have developed the level of competition necessary to drive interstate access charges to economic costs, the IXC petitioners contend that the FCC's decision to adopt a market-based approach is arbitrary and capricious.

The FCC counters that its objective was to drive access charges toward competitive levels in a way that was pragmatic, would preserve universal service, would avoid unnecessary economic dislocation, and was consonant with Congress's directive that the Commission replace regulation with competition to the greatest extent possible consistent with the public interest. <u>See, e.g.</u>, 47 U.S.C.A. § 257(b) ("[T]he Commission shall seek to promote the policies and purposes of this chaptor favoring diversity of media voices, vigorous economic competition, technological advancement, and promotion of the public interest, convenience, and necessity."); <u>see also</u> <u>Order</u> ¶¶ 1, 9, 42, 44, 47, 262, 263. The IXC petitioners' claim ignores the FCC's "'broad discretion in selecting methods . . . to make and oversee rates.'" <u>MCI Telecomms.</u>

Corp., 675 F.2d at 413 (quoting Aeronautical Radio, Inc. v. FCC, 642 F.2d 1221, 1228 (D.C. Cir. 1980)) (alteration by this Court), cert. denied, 451 U.S. 920, 976 (1981)). The Commission explained that "competitive markets are far better than regulatory agencies at allocating resources and services efficiently for the maximum benefit of consumers." Order ¶ 42. Furthermore, this approach appears to be consistent with Congress's preference for "a pro-competitive, deregulatory national policy framework" for the telecommunications industry. Id., ¶ 1. We note further that § 205(a) permits the FCC to take the extreme action of prescribing rates only when, among other things, the rates currently charged are "or will be in violation of any of the provisions" of the Act. 47 U.S.C. § 205(a) (1994). The FCC has reasonably exercised its predictive judgment in concluding that competition in the local telephone services market will effectively drive interstate access charges to economic costs. See City of St. Louis, 936 F.2d at 1534 (noting that judicial deference to agency action is "especially important" when agency's judgments are "predictive"). If, in light of actual market developments, the Commission determines that competition is not having the anticipated effect on access charges, the agency presumably will revisit this issue. We cannot conclude at this time that the FCC's decision to adopt a market-based approach to interstate access reform was arbitrary, capricious, or in derogation of the public interest in light of the broad discretion Congress has given the Commission in setting interstate rates.

The IXC petitioners next contend that the FCC failed to explain adequately its decision to retain "inflated" access charges to the detriment of long-distance carriers in order to avoid the negative consequences to LECs of imposing cost-based rates immediately. They argue that the LECs have enjoyed excessive and unlawful earnings as a result of access charges based on historical rate-of-return costs rather than on forward-looking economic costs. The FCC has acknowledged that non-cost-based access charges harm both long-distance companies and their customers and impede competition in the long-distance market. See, e.g., Order ¶ 30. Yet, according to the IXC petitioners, the Commission has failed to explain why these concerns have not

been alleviated through an immediate move to cost-based access charges. According to the IXC petitioners, the only effect on the long-distance market that the FCC addressed was the effect these rates have on competition when local telephone companies also provide long-distance services directly or through an affiliate. They argue that, although a LEC would impose the same "inflated" access charge on its affiliate as it would on unaffiliated long-distance companies, because of the affiliation, the transaction has no true economic effect. The IXC petitioners contend that perpetuating "inflated" access charges allows LECs and their affiliate long-distance companies to take advantage of their lower real cost of access to cherry pick the IXCs' most lucrative customers or to engage in price squeezing to undercut the IXCs' prices. Furthermore, unaffiliated long-distance companies would be inclined to purchase inefficient, but less expensive, access arrangements from alternative providers, while LEC-affiliated long-distance companies would always use the most efficient access arrangements and incur only actual, rather than "inflated," costs. The IXC petitioners contend that the FCC's rationale and its reliance on alleged safeguards to prevent these situations are insufficient to justify its decision.

The FCC initially notes that the access rates charged by incumbent LECs, while based on historical costs rather than forward-looking economic costs, are permissible under the "just and reasonable" standard prescribed by § 201(b) of the Act. Cf., e.g., Competitive Telecomms., 117 F.3d at 1072 (noting "just and reasonable" standard under § 251 of the 1996 Act). Furthermore, the Commission disputes the correlation the IXC petitioners claim exists between the LECs 1996 earnings levels and "inflated" access rates under the current price-cap regime. The FCC points out that higher returns for price-cap carriers do not necessarily indicate imposition of unlawful rates under the price-cap regime. Rather, the purpose of price-cap regulation is to promote efficient use of the network while ensuring that rates, as opposed to earnings, are no greater than they would have been under historical rate of return regulation. See Order ¶¶ 292-93. Furthermore, even if LECs were earning unlawfully high returns as a result of current historic-cost-based access charges, setting rates on the basis of forward-looking

economic costs is not statutorily required, and the FCC could impose an alternative solution that effectively and permissibly reduced rates. As to the IXCs' argument that the Commission's failure to prescribe access charges to forward-looking economic costs creates conditions for an anticompetitive price squeeze when a LEC affiliate offers interexchange service, the FCC responds that these concerns are unwarranted because adequate safeguards are in place to prevent such an occurrence. See Id. ¶¶ 278-79, 281. The Commission notes that independent (non-Bell Operating Company) incumbent LECs[13] have been providing long-distance service for some time "with no substantiated complaints of a price squeeze." Id. ¶ 279. In addition, the FCC expects that increasing access service competition will give unaffiliated IXCs alternative sources of access that would lessen the risk of a price squeeze by incumbent LECs. See Id., ¶ 280. Deferring, as we must, to the agency's expertise in this highly technical area, we conclude that the FCC adequately explained its decision not to prescribe access charges at forward-looking economic costs and that its decision is not arbitrary or capricious. See Downer v. United States, 97 F.3d 999, 1002 (8th Cir. 1996) (per curiam) (noting that "reviewing court may not substitute its judgment for that of the agency and must give substantial deference to agency determinations").

The IXCs next contend that the FCC's failure to prescribe access charges at forward-looking economic costs leaves implicit universal subsidies embedded in current access charges in violation of the 1996 Act. These subsidies allegedly violate (1) § 254(d) because, being recovered primarily from IXCs, they are not "equitable and nondiscriminatory"; (2) § 254(e) because they do not provide universal service support that is "explicit"; and (3) § 254(k) because they constitute prohibited subsidies. These claims, like the BellSouth claims addressed earlier in this opinion, are premised upon the mistaken assumption that § 254 requires immediate implementation of a new

---

[13]The Commission lists, for example, GTE, Southern New England Telephone Company, and Sprint as independent incumbent LECs offering in-region long-distance service.

-53-

universal support mechanism.  As we noted above, § 254 requires merely that the Commission establish a "specific timetable for implementation" of the new universal support regime, 47 U.S.C.A. § 254(a)(2), and the FCC has complied with this mandate, see Order ¶ 47.

In a related argument, the IXCs contend that the FCC's regulatory choice of a market-based approach to drive access charges to economic costs cannot be justified on the basis of universal service support needs, because the Commission did not rely on this rationale in the Order.  "If the agency itself has not provided a reasoned basis for its action, the court may not supply one."  Downer, 97 F.3d at 1002.  Moreover, the IXCs argue that even were this Court permitted to consider this untimely justification, universal service needs cannot supply a reasoned basis for permitting inflated access charges after January 1999, when the new universal service mechanism will be implemented.

We note that the Commission explained in the Order that it would "not remove all implicit [universal service] support from all access charges immediately" because "eliminating [such support] all at once might have an inequitable impact on the incumbent local exchange carriers," a statement that can be read to implicate universal service support needs.  Order ¶ 9; see also id. ¶ 46 (noting that a prescription "could result in a substantial decrease in revenue for incumbent LECs, which could prove highly disruptive to business operations, even when new explicit universal service support mechanisms are taken into account").  While the FCC, in the Order, may have made only passing, nonspecific reference to universal service support needs as grounds for this decision, we cannot say that the Commission is precluded from advancing the universal service rationale for its decision not to prescribe forward-looking economic costs.  Moreover, the IXCs' argument ignores the fact that the Commission believed that prescribing rates was, in any circumstances, an inferior solution to the problem.  The FCC was informed by Congress's directive to "promote competition and reduce regulation," Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (to

be codified as amended in scattered sections of 47 U.S.C.), and elected the market-based approach based on this mandate, in addition to any universal service support considerations.

We have reviewed carefully the FCC's justifications for retaining the current interstate access charge regime and find its decision based on these factors to be neither arbitrary nor capricious. We find that the Commission's discretionary authority to exercise its expertise necessarily includes the discretion to adopt a market-based approach rather than a prescriptive approach to driving interstate access rates toward economic costs. As this Court has noted, "it is clear from the [1996] Act that Congress did not intend all access charges to move to [forward-looking] cost-based pricing, at least not immediately." Competitive Telecomms., 117 F.3d at 1072.

## B. TIC Charges

The IXC petitioners next argue that the FCC's refusal to abolish the non-cost-based transport interconnection charge (a per-minute charge assessed on all switched access minutes) despite its adverse effect on the long-distance market is arbitrary, capricious, inconsistent with the Commission's own policy, and a violation of the District of Columbia Circuit's order in CompTel. They argue that, although the FCC has acknowledged that the TIC is not cost-based, and "adversely affects the development of competition in the interstate access market," Order ¶ 212, it has refused to move immediately to eliminate these non-cost-based transport charges and has failed to explain its reasons for not doing so. In CompTel, the District of Columbia Circuit directed the FCC "to move expeditiously upon remand to a cost-based alternative to the [TIC], or to provide a reasoned explanation of why a departure from cost-based ratemaking is necessary and desirable in this context." 87 F.3d at 532.

Contrary to the IXCs' contention that the FCC has not made a concerted effort to determine and allocate the costs improperly included in the TIC, the Commission has found a series of service-specific costs that had been incorporated in the TIC, but that

could be separated out and charged to long-distance carriers on a cost-causative basis. See Order ¶¶ 167, 170-73, 217, 219-21 (including SS7 signalling costs, ¶ 217, "multiplexing costs," ¶ 173, and "[h]ost/remote trunking costs," ¶ 220). As to the remaining costs that could not be assigned to a particular facility--the "residual TIC"-- the FCC implemented a plan designed to eliminate those costs "as quickly as possible consistent with avoiding short-term market distortions." Id. ¶ 234. LECs were instructed to "migrate" their remaining per-minute TIC charges to flat-rated pre-subscribed interexchange carrier charges, id., and to target their annual price-cap productivity adjustments to the TIC, see id. ¶¶ 234-38. The result of these regulatory changes, according to the FCC, is "that the per-minute TIC charge will be eliminated in two to three years." Id. ¶ 64. In addition, to the extent that the residual TIC raises issues concerning the jurisdictional separations process,[14] the Commission stated that it will refer such issues to a Federal-State Joint Board, as required by the 1996 Act. See id. ¶ 213. In our opinion, the FCC has made reasonable progress toward establishing a cost-based alternative to the TIC, and, in cases where this objective has proved elusive, the FCC has explained adequately its reasons for not acting immediately.

The Commission explained in the Order that its goal was "to establish a mechanism to reduce and eliminate the TIC in a manner that fosters competition and responds to the D.C. Circuit's remand." Id. Consistent with this objective, the agency properly adopted a number of short-term, transitional solutions to protect against needless disruption and unfairness, while pursuing its goal of moving toward cost-based rates. See, e.g., Rural Tel. Coalition v. FCC, 838 F.2d 1307, 1314-15 (D.C. Cir. 1988). We conclude that the FCC's decisions temporarily to retain the TIC after reallocating identifiable costs to their particular elements, to eliminate gradually the

---

[14]In this context, the jurisdictional separations process refers to the determination of "whether certain costs currently allocated to the interstate jurisdiction and recovered through the TIC more properly should be allocated to the intrastate jurisdiction." Order ¶ 213.

residual TIC through, among other methods, price-cap targeting and the PICC, and to refer jurisdictional separations concerns to the Joint Board are not arbitrary, capricious, inconsistent with the agency's policies, or in violation of the District of Columbia Circuit's CompTel order.

## C. Tandem Switch Charges

The IXC petitioners next argue that the FCC's decision to retain non-cost-based tandem switching charges is arbitrary, capricious, inconsistent with the Commission's policy, and a violation of the D.C. Circuit's order in CompTel. They contend that the FCC failed to explain its decision to allocate overhead expenses--those not directly attributed to a particular service--to the tandem-switched transport relied upon by smaller long-distance carriers in a manner different from the way in which overhead costs are allocated to the direct-trunked transport relied upon by AT&T, and failed to remedy the discriminatory results of this decision. The FCC's Part 69 allocation rules,[15] according to the IXC petitioners, do not distribute the LECs' overhead proportionately among interstate service categories. These rules allocate a predominant share of overhead to switched access (including switched transport), while special access (including direct-trunked transport) is assigned comparatively little overhead. The IXC petitioners claim that the FCC failed to consider new cost data, failed to gather additional information in light of the CompTel remand, and failed to undertake any type of empirical review of tandem switching costs and overhead before reaching its conclusion in the Order. The FCC's explanation that "it is reasonable to have set

---

[15]These rules allocate interstate direct investment to certain categories. See 47 C.F.R. §§ 69.301-69.307 (1997). Other investment and expenses, including overhead in both cases, are allocated among these categories in proportion to the dollar amounts of net direct investment allocated to the categories, see id. §§ 69.309, 69.411 (1997), and direct expenses are allocated to the category to which the expenses are related, see id. § 69.401-69.409 (1997) (We refer to §§ 69.305, 69.306, 69.309, and 69.411, as they were amended effective January 1, 1998. They are published in the 1997 C.F.R.).

overhead loadings for tandem switching consistently with the overhead loadings for local switching" misses the point, according to the IXC petitioners. Order ¶ 203. Finally, they object to the Commission's decision to reassign some TIC costs to the tandem switching charge as exacerbating the problem, and to the FCC's reliance on market forces to reduce the tandem switch charges to cost as unreasonable and without supporting evidence.

After reviewing the FCC's revisions to the transport rate structure, including those associated with tandem-switched transport, we conclude that they lie well within the agency's authority and discretion, are consistent with Congress's cost-causation goal, and reflect a reasonable outcome in light of that goal. In CompTel, the D.C. Circuit ordered the FCC to "substantiate that its current method of allocating overhead is cost-based, or choose a method that is." 87 F.3d at 536. The Commission reviewed its Part 69 cost allocation rules, made some changes that it determined would produce a reasonable allocation of interstate costs, and concluded that no alternative that had been suggested by the responding parties during the rulemaking proceeding would ensure a more accurate cost allocation. See Order ¶¶ 202-205. The IXC petitioners do not criticize any particular rule of Part 69, but rather assert that the effect of these allocation rules as a whole is a discriminatory underallocation of overhead to special access and an overallocation of overhead to other access elements including tandem switching. The IXC petitioners, however, do not present any direct evidence of this alleged disparity in allocation. As the FCC explained in the Order, these rules "established category revenue requirements that included overheads allocated generally based on relative costs." Id. ¶ 203. It further stated:

> We find that it is reasonable to have set overhead loadings for tandem switching consistently with the overhead loadings for local switching, and disagree with those parties that argue that there is no cost justification for the current allocation of overheads to the tandem switch. The direct costs of both kinds of switching are fundamentally the same in that both types of switches are comprised of ports and a switching matrix. By contrast,

the direct costs of transmission consist of outside plant and circuit equipment and certain central office equipment. So long as consistent overhead loading methodologies were used across switching functions, and across transmission functions, we find that a reasonable cross-over is established for access customers between direct-trunked transport and tandem-switched transport. As competition develops, we can also rely on market forces to pressure incumbent LECs to allocate overheads among rate elements in economically efficient ways.

Id. In other words, the Commission concluded that similar access functions should receive similar overhead loadings. The Commission reasonably determined that there was no need to change the overhead loading attributed to tandem-switching because the "current methods allocate overhead in a reasonable, cost-based manner." Id. ¶ 202. The Commission's conclusion that each of the Part 69 cost allocation rules refined or adopted in the Order is reasonable and based on cost-causative principles, and its explanation for this belief, lead us to conclude that the agency's new rules for the computation of tandem switching charges are not arbitrary and capricious and are not in violation of the D.C. Circuit's order in CompTel.

## D.  Unitary Rate Structure

The IXC petitioners next challenge the FCC's decision to eliminate the unitary rate option for tandem-switched transport as arbitrary and capricious in that it imposes inconsistent distance measurements for similar transmission services. According to the IXC petitioners, both tandem-switched transport and direct-trunked transport services generally follow the same transmission paths and therefore should be subjected to the same rates. In the Order, the FCC left the distance-sensitive rate structure for direct-trunked transport unaltered, but eliminated the likewise distance-sensitive unitary rate option for tandem-switched transport. Under the unitary rate option, long-distance carriers paid for tandem-switched transport in the same manner they paid for direct-trunked transport: through an end-to-end charge, with mileage measured as airline mileage from the LEC's wire center to the end office. See Order ¶¶ 158, 159. With the

imposition of the new three-part rate structure, tandem-switched service is broken down into its component parts and rates are applied as follows: (1) a per-minute charge for transmission from the end office to the tandem; (2) a per-minute charge for the tandem switching function itself; and (3) a flat-rated charge for transport over "dedicated transport facilities" from the tandem to the serving wire center. Id. ¶ 175. The charges for transmission from the end office to the tandem and from the tandem to the serving wire center remain distance-sensitive, although they are not computed on an end-to-end basis. The IXC petitioners contend that by allowing the LECs to charge separately for each of the three legs of the transmission, the LECs will route this traffic inefficiently in order to increase artificially the distance involved in completing the transmission, thereby inflating the costs to tandem-switched transport customers.

The FCC justified its elimination of the unitary rate option because it "does not accurately reflect the manner in which LECs incur costs in providing tandem-switched transport and, therefore, does not provide maximum incentive for IXCs to use transport facilities efficiently." Id. ¶ 178. Furthermore, the unitary rate option "inhibits the development of competitive alternatives to incumbent LEC tandem-switched transport." Id. ¶ 179. The Commission concluded that the three-part rate structure "most closely reflects the manner in which LECs incur the costs of each component of the overall tandem-switched transport service." Id. ¶ 181. As the IXC petitioners recognize, purchasers of direct-trunked transport purchase transport capacity between two end points from the LEC. Tandem-switched transport customers, on the other hand, purchase use of the tandem switch to route traffic to their point of presence and specifically obligate the LEC to transport their traffic between the serving wire center and the tandem serving a particular end office. "Because they cause the incumbent LEC to incur the costs of transmitting their traffic between the serving wire center and the tandem, tandem-switched transport customers should, as a matter of cost-causation, pay the costs of reaching the tandem." Order ¶ 182. "While the incumbent LEC may choose to route direct-trunked traffic through the tandem office based on its own assessment of whether it is economically efficient to do so," tandem-switched traffic

must be routed to the tandem office, and so should bear the costs reaching the tandem. Id. ¶ 186. The IXCs' contention that LECs would circuitously route tandem-switched traffic in order to increase distances and artificially inflate rates was addressed by the Commission in the Order and dismissed as unlikely since such behavior would place greater costs on the LEC in an environment that is designed to encourage competition. See id. ¶¶ 183-84.

We conclude that the FCC's decision to eliminate the unitary rate option for tandem-switched transport was neither arbitrary nor capricious. The Commission reasonably concluded that the three-part rate structure would "encourage efficient use of transport facilities by allowing pricing that reflects the way costs are incurred," id., ¶ 177, and "permit the fullest development of competitive alternatives" for each distinct element of tandem-switched transport, id. ¶ 179.

**E. 9000 Minutes Per Circuit**

The IXC petitioners next argue that the Commission's decision to abandon the admittedly imperfect interim rate structure for tandem-switched local transport that was based on an estimated 9000 minutes of use for each circuit[16] is arbitrary and capricious. According to the IXC petitioners, the method adopted by the FCC in the Order-- compiling actual minutes of use per circuit in a "year prior to implementation" of the Order and using this figure as an estimate for future years--is incompatible with the agency's prior determination that the benefits to be obtained from a more individualized calculation were outweighed by the administrative convenience of a uniform figure. IXC Petitioners' Joint Brief at 68. The FCC justifies its position on the belief that its

---

[16]Under the interim rate structure, LEC per-minute tandem-switched transport rates are presumed reasonable if they are set based on "a weighted average of DS1 and DS3 rates reflecting the relative numbers of circuits of each type in use in the tandem-to-end office link, and assuming circuit loading of 9000 minutes of use per month per voice-grade circuit." Order ¶ 206.

9000 minute usage estimate is too high; but the IXC petitioners contend that, because competition presumably will increase usage of these circuits, the new method of calculating rates "based on the prior year's annual use" virtually guarantees that these usage estimates will be low by a substantial amount for every LEC.  Order ¶ 206.  Moreover, the IXC petitioners argue that the Commission has not explained its rationale for selecting this option over other, more suitable alternatives.  According to the petitioners, because the Commission failed to state any purpose for its decision to change methods, other than the inaccuracies of the old method, its choice of an even more inaccurate method is arbitrary and capricious.

The IXC petitioners' central argument fundamentally misapprehends the FCC's Order.  Contrary to their assertion that the FCC's new method contemplates calculating a fixed usage estimate based on circuit usage for the year prior to implementation of the Order, and in turn applying that figure to all future years, the FCC's new rules require an annual recalculation of usage estimates based on the actual minutes of use during "the prior year[]."  Id. (emphasis added).  The FCC explained that its shift from an arbitrary usage estimate number that consistently overstates minutes of use to a more precise measure of actual usage is consistent with the Commission's goals of moving toward cost-causational rates.  The agency's choice of a reasonable solution from a number of acceptable alternatives is within the agency's discretion and is not arbitrary or capricious.

## F.  Recovery of Universal Service Subsidies from IXCs

The IXC petitioners and Texas Counsel object to the Commission's decision to allow price-cap LECs to recover their contributions to the new universal service fund from the LECs' interstate customers--both end users and long-distance carriers--by increasing interstate access charge price caps imposed on interstate customers by the amount LECs contribute to the fund.  The new universal service regime requires that all telecommunications carriers providing interstate telecommunications services contribute to the new universal service fund a proportion of their revenues derived from

end users. See Universal Service Order ¶ 39-40. Since both LECs and IXCs receive revenue from end users, both types of carriers must contribute to the fund. The IXC petitioners contend that, as a result of the agency's decision, "long distance companies are required to pay their share of universal service support directly, and to also pay the LECs' share of universal service support through access charges." IXC Petitioners' Joint Brief at 70. This, according to the IXC petitioners, amounts to an implicit subsidy that discriminates against IXCs in violation of § 254(e), and is not competitively neutral as required by § 254(d).

We cannot agree that allowing LECs to recoup from their interstate customers the normal costs of providing telecommunications services to those customers amounts to creating a discriminatory implicit subsidy. As the FCC points out, mandatory contributions to the new universal service fund are real costs of doing business that will be incurred by both LECs and IXCs. The agency determined that "[u]nder our recovery mechanism, carriers will be permitted, but not required, to pass through their contributions to their interstate access and interexchange customers." Universal Service Order ¶ 829. Under this scheme, IXCs have the option of recovering their universal service contributions through rates to their long-distance customers. LECs have the same option of passing on the costs of contributions to their interstate customers--both end users and IXCs. See Order ¶ 379. Access charges imposed on IXCs that include the LECs' universal service cost are not "above cost" since universal service contributions are a real cost of doing business. The flow-through of LEC universal service costs to its IXC customers is akin to the flow-through of IXC universal service costs to its long-distance customers--neither can be categorized as an implicit subsidy in violation of § 254(e). The IXC petitioners' argument that long-distance carriers affiliated with a LEC will have a competitive advantage over unaffiliated long-distance carriers because the flow-through of LEC universal service contributions to a subsidiary is not a "real" cost fails to persuade us that the FCC's decision is in contravention of § 254(d)'s requirement that rates be competitively neutral. As noted above, contributions to the new universal service fund are real costs

of doing business; if a LEC decides not to pass through such costs to its long-distance affiliate, it must absorb the cost itself--which it is free to do under the Commission's rules. Moreover, a LEC may not discriminate against similarly situated carriers by passing through its contribution costs to non-affiliates while absorbing the costs for its affiliates. See Universal Service Order ¶ 851 (noting that LECs are "permitted to pass through their contribution requirements to all of their customers of interstate services in an equitable and nondiscriminatory fashion").

Texas Counsel, on the other hand, apparently interprets the Order to mean that end users[17] alone will be subject to the pass-through of LECs' universal service contributions through increases in SLCs paid by end users. As the FCC notes, however, the pass-through of universal service costs generally will not result in any immediate increases in SLCs paid by end users because the calculation of the SLC is not currently affected by changes in the price-cap index. Furthermore, contrary to Texas Counsel's arguments, the FCC properly allowed price-cap increases only on interstate end-user revenues since the universal service contribution cost being passed through is assessed on the basis of end-user revenues. See Order ¶ 379 ("[P]rice cap LECs recovering their universal service obligation through interstate access charges must recover those contributions in the baskets for services that generate end-user interstate revenues. . . . The baskets containing end-user interstate services are the common line, interexchange, and trunking baskets."). Under the Commission's plan, the LECs have flexibility to determine how to recover their universal service contributions and to decide how much, if any, of those contributions to pass through to their customers. Id.

We conclude that the FCC's decision to allow LECs to recover their contributions to the new universal service fund from their interstate customers through

---

[17]"End user" is defined for our purposes as "any customer of an interstate . . . telecommunications service that is not a carrier." 47 C.F.R. § 69.2(m) (1997).

an increase in the price-cap indices for baskets that generate end-user interstate revenues is not arbitrary or capricious or in violation of the 1996 Act. We note that this determination, based on extremely technical factors, has been made by the expert agency in charge of monitoring the telecommunications market and is entitled to deference--particularly because it involves an area requiring expertise. We further note that "[t]his court . . . patrols the perimeters of an agency's discretion. If an agency . . . does not attempt either to close itself off from informed opinion or to extend its reach beyond the scope of permissible authority, then it is our duty to accept that judgment if it is rational and not unreasonable." National Ass'n of Regulatory Util. Comm'rs., 737 F.2d at 1140. We find that the FCC's decision is a rational and reasonable one under the 1996 Act.

## IV. Texas Counsel
## A. Intrastate Revenue Shortfall

Petitioner Texas Counsel first objects to the FCC's requirement that carriers receiving funds from the new federal universal service mechanism apply those funds "to reduce or satisfy the interstate revenue requirement otherwise collected through interstate access charges." Order ¶ 381. They argue that universal service will be threatened by the Commission's decision, that the elimination of high-cost and DEM[18] weighting mechanisms will bring about an intrastate revenue shortfall, and that the existing federal-state jurisdictional cost-shifting mechanisms should be retained. The FCC contends that this requirement is reasonably necessary to ensure that universal service subsidies are made explicit as required by § 254(e) and to prevent double recovery by carriers receiving funds from the new federal universal service mechanism.

---

[18]DEM, or dial equipment minutes of use, "is defined as the minutes of holding time of the originating and terminating local switching equipment." 47 C.F.R. § 36.125(a)(3) (1997).

In the Universal Service Order, the Commission moved toward achieving its goal of eliminating implicit subsidies and replacing them with subsidies that are "explicit" and "sufficient," 47 U.S.C.A. § 254, by requiring all interstate telecommunications carriers to contribute to the federal share (twenty-five percent) of universal service support. See Universal Service Order ¶ 269. After a transition period, the new system adopted in the Universal Service Order will replace current funding mechanisms, including high-cost and DEM weighting mechanisms, by which small and high-cost LECs have been allowed to shift a greater proportion of certain intrastate costs to the interstate jurisdiction and then recover those costs, directly or indirectly, through above-cost interstate access charges imposed on IXCs. See id. ¶¶ 209-212. The FCC maintains that the gradual elimination of high-cost and DEM weighting mechanisms necessitates corresponding reductions in the access charges of carriers receiving the new universal funds. If no such adjustments were made, according to the FCC, carriers receiving the new funds could obtain a double recovery--once through the new federal universal service fund, and again through above-cost access charges imposed on IXCs. Consequently, the Commission directed "incumbent LECs to use any [federal] universal service support received from the new universal service mechanisms to reduce or satisfy the interstate revenue requirement otherwise collected through interstate access charges." Order ¶ 381. This language advises LECs that once carriers begin receiving funds from the new federal universal service mechanism, they must lower their interstate access charges to the extent that those access charges reflect implicit subsidies of universal service.[19]

---

[19]The FCC recently referred to a Federal-State Joint Board a number of issues originally addressed in the Universal Service Order: (1) the propriety of the twenty-five percent division for the federal share of universal service support; (2) the extent to which federal universal service support should be applied to the intrastate jurisdiction; and (3) the method, if any, by which providers may recover universal service contributions through rates, surcharges, or other means. See In re Federal-State Joint Board on Universal Service, Order and Order on Reconsideration (CC Docket No. 96-45), FCC 98-160, 13 FCC Rcd No. 19 13749 (released July 17, 1998). In addition, the Commission extended "the implementation date for the revised high cost support

Texas Counsel's concern that the elimination of high-cost and DEM weighting mechanisms will bring about an intrastate revenue shortfall are premature. Whether or not intrastate revenue shortfalls actually will occur depends upon a number of factors not yet decided by the FCC. The Commission noted in the Order:

> In the *Universal Service Order*, we conclude that, until universal service support is based on forward-looking economic cost, carriers should continue to receive amounts from the new universal service mechanisms comparable to existing high cost and DEM weighting support. In that order, we do not alter the existing revenue-shifting mechanisms in place for the current high cost support and DEM weighting at this time. Thus, no intrastate revenue shortfall will occur, because no revenue requirement is being shifted back to the intrastate jurisdiction.

Id. ¶ 387 (footnote omitted). Because the level of universal service funding and the jurisdictional allocation will remain roughly constant, Texas Counsel's fear of an intrastate revenue shortfall is speculative, at best. The requirement that a certain level of intrastate universal service be maintained and whether that requirement will be satisfied, depend on a number of factors that have yet to be decided. See, e.g., Universal Service Order ¶¶ 248-249. Texas Counsel offers no reason to find at the present time that the combined state and federal funding mechanisms--once their details have been determined--will not provide sufficient levels of universal service support after the transition period has passed. This Court recently reaffirmed that

> [t]he basic rationale of the ripeness doctrine is to prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an

---

mechanism for non-rural carriers . . . by six months from January 1, 1999, to July 1, 1999." Id. These actions do not change our resolution of the issues presented here.

administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

California v. FCC, 124 F.3d at 943 (citations to all quoted cases omitted).

Assuming for the sake of argument that Texas Counsel's complaint is ripe for review, we nonetheless would conclude that the Commission acted within its authority to require LECs to adjust their interstate access charges to reflect changes in the universal service support mechanisms. Texas Counsel makes a number of arguments advancing its position that the current jurisdictional arrangement is required by the Act. Under that arrangement, some portion of the loop and switching costs above the level that would be justified by relative use is shifted to the interstate jurisdiction through the high-cost and DEM weighting programs. These arguments are not persuasive. The Commission is authorized to determine and alter allocations between interstate and intrastate jurisdictions after consulting with the Federal-State Joint Board, and courts consistently have upheld the FCC's determinations as to what proportion of shared costs will be recovered in the interstate jurisdiction. See, e.g., Rural Tel. Coalition, 838 F.2d at 1313-15 (upholding FCC decision to allocate twenty-five percent of non-traffic-sensitive costs to interstate jurisdiction); Hawaiian Tel. Co. v. Public Utils. Comm'n, 827 F.2d 1264, 1274-76 (9th Cir. 1987) (holding FCC separations decision preempted independent proceedings by Hawaiian Public Utilities Commission), cert. denied, 487 U.S. 1218 (1988).

Likewise, we reject Texas Counsel's argument that the FCC was compelled to refer to a joint board its proposal to require LECs to use funds from the new federal universal service mechanism to reduce the interstate revenue requirement. Joint board consultation is required only in proceedings "regarding the jurisdictional separation of common carrier property and expenses between interstate and intrastate operations." 47 U.S.C.A. § 410(c). "'Jurisdictional separation' is a procedure that determines what proportion of jointly used plant should be allocated to the interstate and intrastate

jurisdictions for ratemaking purposes." MCI Telecomms. Corp., 750 F.2d at 137. In its Order, the FCC was not allocating jointly used plant, nor was it changing the proportions for allocating jointly used plant to interstate and intrastate jurisdictions. The Commission decided only that federal support for universal service should be applied to satisfy the interstate revenue requirement, with the details remaining to be determined. See Order ¶¶ 381, 387.

Texas Counsel's argument that § 254(e) prevents the Commission from requiring the application of federal universal service funds to the interstate jurisdiction is also without merit. Section 254(e) provides that "[a] carrier that receives [federal universal service] support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended." 47 U.S.C.A. § 254(e). In the Universal Service Order, the Commission determined that the "core" services intended to be supported by universal service mechanisms included "single-party service; voice grade access to the public switched network; . . . access to emergency services; access to operator services; access to interexchange service; access to directory assistance; and toll limitation services for qualifying low-income consumers." Universal Service Order ¶ 61. Contrary to Texas Counsel's argument, funds from the new federal universal service mechanism will be applied toward the portion of costs allocated to the interstate jurisdiction that is associated with providing the above services. Section 254(e) is not violated by the Commission's decision to require amounts received under the new federal universal service mechanism be applied "to reduce or satisfy the interstate revenue requirement" for the above "core" services. Order ¶ 381.

The language to which Texas Counsel objects is a general statement of a fundamental premise underlying the reform of implicit subsidies: that carriers receiving new federal universal service support will be required correspondingly to reduce their interstate access charges to the extent those charges include implicit universal service

subsidies. We conclude that the FCC has not acted arbitrarily or capriciously in making this determination.

## B. Increase in SLC for Secondary Residential and Multi-Line Business Lines

Texas Counsel advances a number of arguments intended to demonstrate that the FCC's decision to increase to nine dollars the SLC cap for multi-line business and secondary residential lines is arbitrary and capricious. The FCC responds that changes made in access charge rate structure rules, including those associated with the SLC, were intended to promote economic efficiency and competition by making the structure more cost-causative while maintaining affordable rates for basic telephone services in high-cost areas. See id. ¶ 82. To advance these goals, and keeping in mind the obligation to preserve universal service, the Commission reduced the per-minute CCL charge paid by IXCs (and passed on to long-distance customers) in favor of higher SLCs for end users. See id. ¶¶ 69-71. The FCC contends that it charted a reasonable middle course in the face of calls both to increase the SLC ceilings and to decrease the SLC ceilings. The Joint Board determined that while "primary residential and single-line business lines are essential to the provision of universal service," id. ¶ 70, universal service concerns for non-primary residential and multi-line business users are not as pressing. See id. ¶ 75. The Commission decided, therefore, to increase the SLC cap only for the latter groups. See id. Based on data in the record, the FCC determined that common line costs were generally below the nine dollar SLC ceiling and that this rate would ensure that incumbent LECs were not prevented from recouping their common line revenues and, at the same time, would prevent "widespread discontinuance of lines by multi-line customers." Id., ¶ 80. The Commission contends that its decision is rational given the statutory imperatives, and that Texas Counsel's criticisms fall short of establishing otherwise.

First, Texas Counsel contends that the FCC's decision is faulty because the Commission, while citing rates of inflation as support for the increase, failed to take into consideration "the offsetting impact of ten-years [sic] of productivity gains" in

setting the new SLC cap. Texas Counsel Brief at 34. Texas Counsel's arguments misapprehend the purpose and application of the SLC price cap. LECs have been required to set their SLCs at "the lesser of the per-line average common line costs allocated to the interstate jurisdiction" or the existing SLC cap. Order ¶ 68. The SLC cap represents the maximum that a carrier may charge an end-user for its common line cost--if the carrier's per-line average costs are lower than the SLC ceiling, it may charge only the amount of those costs. If these amounts are less than the SLC ceiling, carriers must charge their actual costs; they are not permitted to impose the higher SLC cap. We conclude that the FCC did not impermissibly ignore productivity gains when increasing the SLC ceilings after taking into account inflation rates. Therefore, the Commission's decision is not arbitrary or capricious.

Texas Counsel next argues that the agency's decision to increase the SLC cap on secondary residential and multi-line business lines is inconsistent with its determination in the Universal Service Order that universal service funding for such lines should be continued while further investigation into permanent subsidies is conducted. By funding these lines, Texas Counsel contends, the Commission "implicitly acknowledges that there are in fact at this time significant affordability concerns with respect to second lines," and that the FCC failed to explain its statement in the Order that affordability concerns are not as great for secondary residential lines. Texas Counsel Brief at 39; see Order ¶ 75 ("Because universal service concerns about ensuring affordable access to basic telephone services are not as great for non-primary residential and multi-line business lines as they are for primary residential and single-line business lines, we must take action to remove the implicit subsidies contained in our current interstate access charges.").

Texas Counsel's argument is without merit. In the Universal Service Order, the FCC followed the recommendations of the Joint Board that existing universal service support for all lines currently receiving support should be retained at least until the January 1, 1999 implementation of the new funding mechanism for non-rural carriers.

See Universal Service Order ¶ 245; see also, Order ¶ 74. The Commission expressed doubt, however, that support for secondary residential lines was consistent with universal service goals. See Universal Service Order ¶ 95 ("We share the Joint Board's concern that providing universal service support [for secondary residential and multi-line business lines] may be inconsistent with the goals of universal service in that business and residential consumers that presumably can afford to pay rates that reflect the carrier's costs to provide services nevertheless would receive supported rates."); see also Order ¶ 74. While primary residential and single-line business lines are clearly part of the basic telephone services to which universal service provisions of the 1996 Act apply, the FCC is not convinced that secondary residential and multi-line business lines warrant the same treatment. The Commission specifically declined to address these issues in the Universal Service Order, and is continuing "to evaluate the Joint Board's recommendation to limit universal service support to primary residential connections and businesses with single connections." Order ¶ 74; see also Universal Service Order ¶ 96. We conclude that the FCC's determination in the Order to increase the SLC cap for secondary residential and multi-line business lines does not contradict actions taken by the agency in the Universal Service Order.

Third, Texas Counsel argues that the increased SLC cap will result in a "free ride by the IXCs on the common line facilities." Texas Counsel Brief at 43. They contend that the recovery of NTS loop costs must be shared by the consumer through end-user charges and the IXC through access charges. Increasing the SLC cap imposed on end users allows IXCs to evade their fair share of these common line costs. As the Commission explained in the Order, however, its "long range goal was to have incumbent LECs recover a large share of the NTS common line costs [directly] from end users instead of carriers, and to recover these costs on a flat-rated, rather than on a usage-sensitive, basis." Order ¶ 68. This decision resulted from recognition that "'[a] subscriber who does not use the subscriber line to place or receive [interstate] calls imposes the same NTS costs as a subscriber who does use the line.'" National Ass'n of Regulatory Util. Comm'rs, 737 F.2d at 1108 (quoting In re MTS and WATS Market

Structure, Third Report and Order (CC Docket No. 78-72), FCC 82-579, 93 FCC 2d 241 ¶ 121 (released Feb. 28, 1983). Thus, simply by requesting telephone service, the subscriber "causes" local loop costs, whether it uses the service for intrastate or interstate calls. See id. at 1113-14. It is therefore appropriate and rational for the Commission to impose those costs on the end user. See Order ¶ 75. We conclude that the FCC's decision to increase the SLC cap on secondary residential and multi-line business lines does not result in a windfall for IXCs. The FCC has exhaustively explained its reasons for raising the cap on these lines, see id. ¶¶ 73-87, and we find that these reasons are rational.

Finally, Texas Counsel argues that the FCC's decision to increase the SLC cap for non-primary lines, allegedly resulting in loop costs being shifted from competitive services to basic services, is contrary to the intent of § 254(k) of the 1996 Act. Section 254(k) provides:

> A telecommunications carrier may not use services that are not competitive to subsidize services that are subject to competition. The Commission, with respect to interstate services, and the States, with respect to intrastate services, shall establish any necessary cost allocation rules, accounting safeguards, and guidelines to ensure that services included in the definition of universal service bear no more than a reasonable share of the joint and common costs of facilities used to provide those services.

47 U.S.C.A. § 254(k). Texas Counsel argues that, by virtue of this provision of the 1996 Act, the recovery of joint and common costs, such as NTS loop costs, must be borne mutually both by end users and by IXCs, and that the FCC is seeking to shift additional NTS loop cost recovery from the rates LECs charge IXCs for interstate access onto the rates end users pay for secondary telephone lines. This, according to Texas Counsel, is in violation of § 254(k) in that the existing proportion of NTS loop

cost recovery by the IXCs through competitive services will be reduced through increases on end users for basic services.

When the Commission implemented the language of § 254(k) in its accompanying regulations, it noted that "the Commission has focused its attention on the incentives that carriers may have to recover the costs of competitive services from subscribers to less competitive, regulated services by misallocating the costs of their competitive services." In re Implementation of Section 254(k) of the Communications Act of 1934, as Amended, FCC 97-163, 12 FCC Rcd No. 11 6415 ¶ 2 (released May 8, 1997). To prevent such misallocations of costs, the FCC established a system of safeguards, including cost allocation rules, "designed to inhibit carriers with market power in regulated service markets from imposing the costs and risks of nonregulated ventures on subscribers to regulated interstate services." Id. ¶ 6.

Texas Counsel's contention that increasing the SLC price ceiling violates the prohibition against using non-competitive services to subsidize competitive services is unpersuasive. As the FCC noted, the first sentence of § 254(k) "addresses the concern that [incumbent LECs] may attempt to gain an unfair market advantage in competitive markets by allocating to their less competitive services, for which subscribers have no available alternative, an excessive portion of the costs incurred by their competitive operations." Id. ¶ 7. Whether a LEC allocates all of its local loop costs to the end-user or to the IXC, the LEC's competitive position as compared to other suppliers of local exchange facilities remains the same. Section 254(k) was not designed to regulate the apportionment of loop costs between end-users and IXCs because this allocation does not involve improperly shifting costs from a competitive to a non-competitive service.

Likewise without merit is Texas Counsel's argument that an increase in the SLC price cap violates the second sentence of § 254(k) by causing services included in the definition of universal service to bear more than a reasonable share of the joint and common costs of facilities used to provide those services. Section 254(k) separates

telecommunications services into those that are supported by universal service, and those that are not. The statute empowers the FCC to establish rules to prevent LECs from overallocating to supported services the costs of facilities that are used to provide services in both categories. See id. ¶ 8. Because the SLC is a method of recovering loop costs, not an allocation of those costs between supported and unsupported services, § 254(k) is not implicated.

## V. Conclusion

We have considered carefully the briefs filed by the petitioners, the intervenors, and the FCC, and we conclude that the actions taken by the Commission in the Order are within the agency's discretion as authorized by Congress in the 1996 Act, and are not arbitrary, capricious, or contrary to law. As we have noted previously, the question presented for our decision is not whether the Commission made the best choice, or even the choice that this Court would have made, but rather "'whether the FCC made a reasonable selection from among the available alternatives.'" MCI Telecomms. Corp., 675 F.2d at 413 (quoting Aeronautical Radio, Inc., 642 F.2d at 1228). "If the agency's reading [of a statute] fills a gap or defines a term in a reasonable way in light of the Legislature's design, we give that reading controlling weight, even if it is not the answer 'the court would have reached if the question initially had arisen in a judicial proceeding.'" Regions Hosp. v. Shalala, 118 S. Ct. 909, 915 (1998) (quoting Chevron U.S.A., 467 U.S. at 843 n.11). We conclude that, in adopting the Order, the FCC reasonably exercised its authority under the Telecommunications Act of 1996 to regulate rates for interstate services. Accordingly, the petitions for review are denied.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.