**Revised May 22, 2001**

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 00-60044

_____

COMSAT CORPORATION; AT&T CORPORATION,

Petitioners,

versus

FEDERAL COMMUNICATIONS COMMISSION; UNITED
STATES OF AMERICA,

Respondents.

---

AT&T CORPORATION,

Petitioner,

versus

FEDERAL COMMUNICATIONS COMMISSION; UNITED
STATES OF AMERICA,

Respondents.

---

Petition for Review of a Final Order of
the Federal Communications Commission

---

May 3, 2001

Before DAVIS, EMILIO M. GARZA, Circuit Judges, and POGUE[*] , District Judge.

EMILIO M. GARZA, Circuit Judge:

Comsat and AT&T, along with intervenors MCI WorldCom, Inc., Sprint Corporation, and Telecommunications Resellers Association, petition for review of *Federal-State Joint Board on Universal Service*, CC Docket No. 96-45, Sixteenth Order on Reconsideration, FCC 99-290, 15 FCC Rcd. 1679 (released Oct. 8, 1999) ("Remand Order"). Finding that Comsat lacks standing, we dismiss Comsat's petition for lack of jurisdiction. With respect to the petition of AT&T and the intervenors, we reverse and remand.

**I**

Pursuant to the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified as amended in scattered sections of title 47, United States Code) ("the Act"), the Federal Communications Commission ("the Commission") issued its 1997 Universal Service Order. *See Federal-State Joint Board on Universal Service*, 12 FCC Rcd. 8776 (1997). Numerous parties challenged that order, and we affirmed it in part and reversed it in part in our decision in *Texas Office of Public Utility Counsel v. FCC*, 183 F.3d 393 (5th Cir. 1999) ("*TOPUC*").

In *TOPUC*, we addressed two portions of the 1997 Universal Service Order pertinent to the petitions now before us. First, Comsat, also a party in *TOPUC*, attacked the inclusion of international services revenue in determining a carrier's universal service fund contribution. Comsat contended that for carriers like itself, who generate minimal interstate services revenues, the FCC's rule required it to pay a universal service contribution that exceeded its interstate services revenues. Comsat maintained that this outcome violated § 254(d)'s requirement that all universal service support be

[*]        Judge, United States Court of International Trade, sitting by designation.

equitable and nondiscriminatory. We agreed and found that the Commission's interpretation of § 254(d), in which it found it could impose such costs on carriers, was "arbitrary and capricious and manifestly contrary to the statute." *Id.* at 434-35.

Second, GTE asserted that requiring incumbent local exchange carriers ("ILECs")[1] to recover their universal service costs through access charges to interexchange carriers ("IXCs")[2] contravened the Act's mandate that all support for universal service be explicit. *See TOPUC*, 183 F.3d at 425. We agreed and concluded that the plain language of 47 U.S.C. § 254(e) did not "permit the FCC to maintain any implicit subsidies for universal service support." *Id.* We further found that by forcing ILECs to "recover their universal service contributions through access charges, the FCC's interpretation maintain[ed] an implicit subsidy for ILECs." *Id.* Accordingly, we reversed and remanded to the FCC.

In response to *TOPUC*, the Commission issued the Remand Order. The agency adopted a bright-line percentage rule for when a carrier's international revenues would be included in the base from which the agency calculates the carrier's universal service contribution. Under the new rule, if a carrier derives less than 8 percent of its revenue from interstate services, its international revenues will not be used in calculating the contribution. For those carriers receiving 8 percent or more of their

---

[1]    A local exchange carrier provides local telephone service within a particular geographical calling area. ILECs were those local exchange carriers historically granted exclusive franchises to provide local service. *See Assoc. of Communications Enters. v. FCC*, 235 F.3d 662, 664 (D.C. Cir. 2001); 47 U.S.C. §153(26) (defining "local exchange carrier"); 47 U.S.C. § 153(47) (defining "telephone exchange service").

[2]    IXCs, long distance carriers, "must obtain access to local telephone customers in order to sell their services. An IXC connects to its long-distance customers by using either special access or switched access facilities." *Southwestern Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1347 (D.C. Cir. 1999).

revenues from interstate services, the FCC will include their international revenue in the base for determining their contributions. The Commission also revised its rule regarding ILEC access charges by permitting, rather than requiring, ILECs to recover their universal service costs through access charges to interstate carriers.[3]

Comsat and AT&T each filed for review of the Remand Order in the District of Columbia Circuit Court of Appeals. Their cases were consolidated and they made a motion to transfer the case to our Circuit, which was granted. MCI WorldCom Inc., Sprint Corp., and Telecommunications Resellers Association intervened.[4] Comsat challenges the Commission's 8 percent rule. AT&T challenges the Commission's decision to permit ILECs to recover universal service fund contributions through access charges to interstate carriers.

## II

As a preliminary matter, we must address the Commission's assertion that Comsat lacks standing to bring this challenge to the universal service fund 8 percent contribution rule. If Comsat lacks standing, we lack jurisdiction to consider its challenge. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) (a party's standing must be addressed first because "[w]ithout jurisdiction the court cannot proceed at all in any cause") (quoting

---

[3]     In a subsequent order, the Commission narrowed its permissive rule to apply it only to non-price cap ILECs and competitive LECs. *See In re Access Charge Reform, Price Cap Performance Review for Local Exchange Carriers, Low Volume Long Distance Users, and Federal-State Joint Board on Universal Service*, Sixth Report and Order in CC Docket No. 96–26 and 94-1, Report and Order in CC Docket No. 99-249, and Eleventh Report and Order in CC Docket 96-45, FCC 00-193, 15 FCC Rcd. 12962, app. B at 56, § 69.158 (2000) (requiring price cap ILECs to recover universal service costs through end user charges, leaving non price cap ILECs and competitive LECs to recover their costs through access charges to IXCs).

[4]     Hereinafter AT&T, MCI WorldCom, Inc., Sprint Corporation, and the Telecommunications Resellers Association are collectively referred to as AT&T.

*Ex parte McCardle*, 7 Wall. 506, 514, 19 L. Ed. 264 (1868)) (opinion of Scalia, J.).

The "irreducible constitutional minimum of standing" requires three things. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992). "First the plaintiff, must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularlized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant. . . . Third, it must be likely as opposed to merely speculative that the injury will be redressed by a favorable decision." *Id.* at 560-61, 112 S. Ct. at 2136 (internal quotations and citations omitted); *see Bertulli v. Indep. Assoc. of Continental Pilots*, 242 F.3d 290, 294-95 (5th Cir. 2001). Comsat bears the burden of demonstrating that it has met these requirements. *See Lujan*, 504 U.S. at 561, 112 S. Ct. at 2136.

Comsat currently makes no payment to the universal service fund, nor are its revenues sufficient to trigger the 8 percent rule. Thus, Comsat's injury is not that it now makes a universal service payment nor that it is subject to the 8 percent rule. Instead, Comsat posits that it suffers from two interrelated injuries. First, it contends that it faces the threat of a massive universal service payment should its interstate revenues reach the 8 percent threshold. Second, the cost of that contribution would be so great as to render entry into the interstate services market unprofitable, and, therefore, the threat of this payment operates as a barrier to Comsat's entry into that market. In support of its argument, Comsat maintains that the threat of payment it faces is analogous to the injury suffered by the New York City Health and Hospitals Corp. ("NYCHHC") in *Clinton v. New York*, 524 U.S. 417, 118 S. Ct. 2091, 141 L. Ed. 2d 393 (1998), which the Supreme Court found sufficient to confer standing on NYCHHC. We disagree.

-5-

In *Clinton*, the Supreme Court concluded that the NYCHHC had standing to challenge the constitutionality of the Line Item Veto Act, 2 U.S.C. §§ 691-692. NYCHHC challenged the President's cancellation of a provision that would have relieved NYCHHC of its contingent liability to the United States, which remained contingent because of a pending petition for a waiver of the liability. *See Clinton*, 524 U.S. at 422, 118 S. Ct. at 2095. Comsat contends that it too suffers from a contingent liability, i.e., the possible universal service payment. In making this comparison, Comsat focuses on NYCHHC's still pending waiver and the potential for relief this waiver provided apart from that which would have been afforded by the provision had it not been canceled. This comparison to NYCHHC is flawed because Comsat assumes that the NYCHHC's contingent liability per se was the injury that gave NYCHHC standing. The Supreme Court's reasoning demonstrates otherwise. In rejecting the government's contention that NYCHHC's injury was too speculative because the liability might still be waived, the Court compared NYCHHC's injury to the setting aside of a favorable verdict and remanding for a new trial. The Court stated: "Even if the outcome of the second trial is speculative, the reversal, like the President's cancellation, causes a significant immediate injury by depriving the defendant of the benefit of a favorable final judgment." *Id.* at 431, 118 S. Ct. at 2099. NYCHHC's injury occurred when the President canceled the provision, depriving it of immediate relief from liability. The fact that NYCHHC's liability might later have been relieved by this waiver did not affect the Court's conclusion that the cancellation caused NYCHHC to lose a benefit which it already had in hand. Comsat, in contrast, does not contend that it lost a benefit. Thus, *Clinton* is inapposite to the case at bar.

A threatened injury satisfies the injury in fact requirement so long as that threat is real, rather than speculative. *See Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S. Ct. 1717, 1724-1725, 109

L.Ed.2d 135 (1990) ("A threatened injury must be certainly impending to constitute an injury in fact.") (internal quotations and citations omitted); *Loa-Herrera v. Trominiski*, 231 F.3d 984, 988 (5th Cir. 2000) ("Mere threatened injury is sufficient, and the threat in this case is real."). Here, in order for the threat of a universal service payment to be sufficiently concrete, Comsat must be able to expand into the interstate services market so as to increase its revenue to the requisite 8 percent. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105, 103 S. Ct. 1660, 1667, 75 L.Ed. 2d 675 (1983) ("Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers."); *Prestage Farms v. Bd. of Supervisors of Noxubee County, Miss.*, 205 F.3d 265, 268 (5th Cir. 2000) (denying standing where party failed to show challenged ordinance had a "concrete effect" on its business endeavors). At this time, however, there are various FCC regulations, unrelated to the challenged rule, that prevent Comsat from expanding its interstate services. Comsat asserted for the first time at oral argument that it had an application pending before the FCC to remove these regulations.[5] Even assuming *arguendo* that this allegation is properly before us, Comsat also admitted that the FCC could remove these in whole or in part. Obviously, the FCC could also decide not to remove any of these regulatory barriers. Consequently, the threat of a universal service payment is conjectural because Comsat cannot expand its interstate services due to those barriers, and the likelihood that it will be able to do so is merely speculative. Therefore, this alleged injury fails to constitute an injury in fact.

As for Comsat's second assertion that this threatened payment bars Comsat from entering the

_____

[5]     Comsat argued for the first time at oral argument that its merger with Lockheed Martin bore on its standing argument. Arguments presented for the first time at oral argument are waived. *See Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 270 (5th Cir. 1998). Thus, we do not consider this argument.

interstate services market, we need not determine whether this injury would constitute an injury in fact. Comsat's inability to enter the interstate market undermines its ability to meet the requirement that the challenged action be fairly traceable to the alleged injury. Comsat's inability to enter the interstate services market results from other regulations, rather than the 8 percent rule; therefore, Comsat does not have standing on this basis. *See Warth v. Seldin*, 422 U.S. 490, 506, 112 S. Ct. 2197, 2209, 45 L. Ed. 2d 343 (1975) (finding failure to demonstrate causation where it appeared that petitioners' financial situations and particular housing needs suggested that their inability to purchase homes in the town resulted not from respondents' actions but from the "economics of the area housing market"). Accordingly, because neither of the proffered bases for standing succeeds, we dismiss Comsat's petition for lack of jurisdiction.

## III

Before proceeding to the merits of AT&T's petition, we must address the Commission's contention that 47 U.S.C. § 405 bars consideration of AT&T's petition. Under § 405, a party must afford the Commission an opportunity to pass on the arguments the party presents for judicial review. *See* 47 U.S.C. § 405.[6] The Commission contends that because AT&T failed to present its assertion (i.e., the agency must eliminate ILEC cost recovery through IXC access charges) to the Commission prior to filing the instant petition for review, we are barred from hearing AT&T's petition for review. We disagree. In the Remand Order, at ¶ 32, the Commission stated: "We believe that the Fifth

_____

[6]      47 U.S.C. § 405 provides in relevant part that:
The filing of a petition for reconsideration [by the Commission] shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking review (1) was not a party to the proceedings resulting in such order, decision, report, or action or (2) relies on questions of factor law upon which the Commission, or designate authority within the Commission has been afforded no opportunity to pass.

Circuit intended to hold only that section 254(e) barred the FCC from requiring incumbent LECs to recover universal service contributions through access charges." *See also id*. at ¶ 33 ("To comply with the Fifth Circuit's order we will expand incumbent LEC's options for recovering their universal service contributions."). In doing so, the Commission discarded the notion that our *TOPUC* holding required the elimination of this implicit subsidy. Where the Commission has considered an argument, § 405 does not preclude review of a petitioner's claim. *See Time Warner Entertainment, Co., L.P. v. FCC*, 144 F.3d 75, 80 (D.C. Cir. 1998) ("So long as the issue is necessarily implicated by the argument made to the Commission, section 405 does not bar our review.").

In reviewing the Commission's actions on the merits of AT&T's claims, we apply the two-step inquiry set forth in *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-843, 104 S. Ct. 2778, 2781-2783, 81 L. Ed. 2d 694 (1984). In step one, we determine whether "Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S. Ct. at 2781. If Congress has done so, we must "give effect to [Congress's] unambiguously expressed intent." *Id.* at 843, 104 S. Ct. at 2781. If we find that the statute is ambiguous with respect to the question at issue, we proceed to step two and "the question for [us] is whether the agency's answer is based upon a permissible construction." *Id.* at 843, 104 S. Ct. at 2782. If we reach this second step, we may only reverse the agency's decision if we find that the decision was "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S. Ct. at 2782.

Section 254(e) provides that universal service support "should be explicit." In *TOPUC*, we concluded that "the plain language of § 254(e) does not permit the FCC to maintain any implicit subsidies." 183 F.3d at 425 (5th Cir. 1999). In this case, in contrast to *TOPUC*, it is not disputed that the recovery of universal service costs through access charge to IXCs is an implicit subsidy. The

FCC concedes, and we agree, that *TOPUC* forecloses such an argument. *See id.*; *see also Alenco Communications, Inc. v. FCC*, 201 F.3d 608, 623 (5th Cir. 2000) ("We made clear in *TOPUC* that the implicit/explicit distinction turns on the distinction between direct subsidies from support funds and recovery through access charges and rate structures."). Because Congress has directly spoken to this issue and the access charge is an implicit subsidy, we review the challenged rule under *Chevron* step-one. Thus, what we must resolve is whether the FCC decision to permit ILECs to continue to recover universal service costs through access charges to interstate carriers violates § 254(e). We hold that permitting this method of cost recovery countermands Congress's clear legislative directive, as we articulated in *TOPUC* and reaffirmed in *Alenco*, that universal service support must be explicit. *See TOPUC*, 183 F.3d at 425; *Alenco*, 201 F.3d at 623 (finding that § 254(e) "mandat[es] that all universal service support by explicit" and, thus, DEM weighting had to be eliminated).

Relying on our decisions in *TOPUC* and *Alenco*, AT&T contends that the Commission cannot permit ILECs to recover their universal service costs via access charges to interstate carriers because § 254(e) requires the elimination of all implicit subsidies. In response, the Commission maintains that our holding in *TOPUC* was much narrower, precluding the FCC only from *requiring* ILECs to recover costs through access charges. *See* Remand Order, at ¶ 32. Moreover, the Commission asserts that this rule harmonizes *TOPUC* with the Eighth Circuit's decision in *Southwestern Bell Tel. Co. v. FCC*, 153 F.3d 523 (8th Cir. 1998). *See* Remand Order, at ¶ 33.[7]

The Commission contends that our holding in *TOPUC* merely proscribed *requiring* ILECS

---

[7] The Commission also contends that the rule permitting access charges is transitional and, therefore, *Chevron* step-two applies, thereby granting it the discretion to continue the implicit subsidy during the transition to the explicit subsidy system. The Commission, however, failed to brief this issue, raising it for the first time at oral argument. Thus, the Commission has waived this argument. *See Zuccarello v. Exxon Corp.*, 756 F.2d 402, 407-08 (5th Cir. 1985).

to recover universal service costs through access charges to IXCs. In support of this contention, the agency points to: (1) the scope of GTE's argument in *TOPUC*; and (2) that we declined to grant standing to MCI as an intervenor. The Commission is correct that GTE at tacked the FCC rule requiring it to recoup universal service costs from access charges to IXCs on the ground that the absence of choice in its cost recovery methods would put it at a competitive disadvantage with potential new competitors. *See TOPUC*, 183 F.3d at 425. Nevertheless, we did not, as the Commission suggested at oral argument, reject the recovery of universal service costs through access charges because it unfairly forced ILECs to use this method of cost recovery. While GTE's argument focused on the absence of choice, the distinction the agency draws between "require" and "permit" is one without a difference. We found that the FCC's previous rule "continue[d] to *require* implicit subsidies," not that *requiring* cost recovery through access charges was t he implicit subsidy. *Id.* (emphasis added). In short, our holding in *TOPUC* that § 254(e) did not permit the Commission to require ILECs to recover universal service costs via access charges turned on the recovery method per se, not whether the Commission permitted or mandated it. Thus, we held that the access charges constituted an implicit subsidy in violation of the clear congressional directive that support for universal service be explicit. *See id*.

Second, the Commission contends that in declining to consider MCI's argument in *TOPUC*, we limited our holding to invalidating the requirement of access charges to IXCs. Specifically, the Commission maintains that our description of MCI's assertions as seeking "the elimination of implicit subsidies" cabins our holding. The FCC tries to glean too much from our decision declining to grant MCI intervenor-standing. MCI, rather than filing a petition for review, sought to intervene in order to challenge the FCC's plan to reduce access charges by the amount received as explicit universal

service subsidies. MCI asserted that the access charges should be reduced "to the forward-looking cost level used by the agency to calculate support for high-costs areas" because the failure to do so violated the FCC's "statutory mandate to eliminate implicit subsidies when it implements the new universal service plan." *TOPUC*, 183 F.3d at 437-38. We found that this challenge differed from those presented by the petitioners. As such, we declined to grant MCI standing, finding that "'we could grant the intervenor the full relief it seeks while rejecting all of the petitioners' challenges and vice versa.'" *Id.* at 438 (quoting *Ill. Bell Tel. Co. v. FCC*, 911 F.2d 776, 786 (D.C. Cir. 1990)). In doing so, we simply indicated that, as a result of the difference between MCI's argument and those proffered by the petitioners, the possibility existed for denying the petitioners relief but granting it to MCI. It was not a comment on what we did or did not hold. As a result, our decision in *TOPUC* not to address MCI's argument does not impinge upon our holding that § 254(e) does not permit the Commission "to maintain any implicit subsidies." *Id.* at 425.

The Commission next maintains that it needed to permit ILECs to recoup their universal service cost via access charges in order to comply with our holding in *TOPUC* and the Eighth Circuit's decision in *Southwestern Bell*. We disagree. Our sister circuit concluded that the recovery of contribution costs from IXCs did not constitute an implicit subsidy, but was "a real cost of doing business." *Southwestern Bell*, 153 F.3d at 554. This finding cannot be harmonized with our holding that the recovery of universal service costs through access charges is an implicit subsidy. *See TOPUC*, 183 F.3d at 425. Furthermore, because the Eighth Circuit reached this conclusion, it did not pass upon the question of whether § 254(e) allowed the FCC to permit a continuation of implicit subsidies. Finally, contrary to the Commission's contention, it could have complied with both *TOPUC* and *Southwestern Bell* by precluding the access charges to IXCs. Thus, we find this

argument unavailing.

In short, we find that our holding in *TOPUC* makes it clear that the "FCC cannot maintain any implicit subsidies" whether on a permissive or mandatory basis. We hold that the FCC's Remand Order permitting the ILECs to recoup universal services costs through access charges is contrary to the plain language of § 254(e).

## IV

For the foregoing reasons, we DISMISS Comsat's petition for want of jurisdiction. We GRANT AT&T's petition for review and we REVERSE and REMAND to the Commission for proceedings not inconsistent with this opinion.

Pogue, Judge, concurring:

I agree with the majority that the decisions in *Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393 (5th Cir. 1999) ("TOPUC"), and *Alenco Communs., Inc. v. FCC*, 201 F.3d 608 (5th Cir. 2000), control the outcome in this case. I write separately to express my concerns with the *TOPUC* court's conclusions that access charges are implicit subsidies, and that "the plain language of § 254(e) does not permit the FCC to maintain *any* implicit subsidies," thus preventing the court from "afford[ing] the FCC any *Chevron* step-two deference in light of this unambiguous Congressional intent." *See TOPUC*, 183 F.3d at 425; *see also Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-43, 104 S. Ct. 2778, 2781-82, 81 L. Ed. 2d 694 (1984) (holding that if "Congress has directly spoken to the precise question at issue," the court must "give effect to [Congress's] unambiguously expressed intent"; if the statute is silent or ambiguous with respect to the question at issue, the court asks "whether the agency's answer is based on a permissible construction of the statute").

Section 254(e) provides that "support *should* be explicit and sufficient to achieve the purposes of this section." 47 U.S.C. § 254(e) (1986) (emphasis added). It is simply not clear to me that this language amounts to a "plain, direct statutory command." *TOPUC*, 183 F.3d at 425. Indeed, it is accepted that "should" does not convey a command in the same way that "shall be explicit" or "must be explicit," as is acknowledged in *TOPUC* itself in addressing a different part of the statute. *See TOPUC*, 183 F.3d at 418 ("Generally speaking, courts have read 'shall' as a more direct statutory command than words such as 'should' or 'may.'") (footnote omitted). Moreover, the statute is silent insofar as it does not define any of the relevant terms ("explicit," "implicit," "support" or "subsidy"),

and the *TOPUC* court recognized that the statute is ambiguous as to the meaning of "explicit." *See TOPUC*, 183 F.3d at 425. It is also relevant that § 254(b) of the statute, which lists "Universal service principles," states that support mechanisms "should be specific, predictable and sufficient . . . to preserve and advance universal service." 47 U.S.C. § 254(b)(5). That § 254(b)(5) does not suggest that support mechanisms should also be explicit makes it even more difficult for me to agree that § 254(e) is unambiguous on its face.

Assuming that the language of § 254(e) is ambiguous, then *Chevron* step two should apply. In *TOPUC*, the FCC advanced an argument that access charges could be maintained because they are explicit to the carrier, even though implicit to the consumer. *See TOPUC*, 183 F.3d at 425. It is not evident to me that interpreting the statute to mean "explicit to the carrier" is an unreasonable interpretation of the language "should be explicit." The statute does not answer the question of *to whom* the support should be explicit, nor does it suggest that support be explicit to all parties. It thus seems to me that the FCC's interpretation may well be reasonable, especially where the support mechanism is otherwise "specific, predictable and sufficient . . . to preserve and advance universal service," and, generally, "to achieve the purposes of this section." 47 U.S.C. §§ 254(b)(5), (e).

Although I respect the controlling effect of *TOPUC* and *Alenco* on the disposition of this case, it is my opinion that the *TOPUC* court failed to afford the FCC's interpretation of the statute the deference required under the *Chevron* doctrine. For these reasons, I concur.